In re MARRIAGE OF Danny Keith BARTON and Kay Lynne Barton,

Danny Keith Barton, Petitioner–Appellant/Cross–Respondent,

and

Kay Lynne Barton, Respondent–Respondent/Cross–Appellant.

Nos. 25773, 25783.

Missouri Court of Appeals, Southern District, Division One.

March 31, 2005.

Steven Privette, Willow Springs, MO, for appellant.

David G. Neal, Neal Law Firm, Eminence, MO, for respondent.

JAMES K. PREWITT, Judge.

The trial court dissolved the marriage of Danny Keith Barton ("Father") and Kay Lynne Barton ("Mother") and granted the parties joint legal custody of their two children, with Father awarded primary physical custody of the oldest son, Broc, born August 27, 1986, and Mother awarded primary physical custody of the youngest son, Blaz, born September 18, 1993. Father appeals the trial court's decision to split custody of the two children and the resulting "restrictive" visitation. Mother cross-appeals with four points relied on, one of which contends that the trial court erred in awarding Father principal custody of Broc. Her other issues are related to the property distribution and the trial court's alleged failure to order sanctions for Father's discovery violations.

## Facts

Father and Mother were married on November 26, 1984, in Oregon County, Missouri. Broc and Blaz were the only children born of the marriage. The couple separated in January, 2001, and Father filed his petition for dissolution on January 24, 2001. Mother filed her answer and counter-petition on February 5, 2001.

On February 2, 2001, the trial court entered an order enjoining the parties from selling, transferring, disposing, destroying, or otherwise encumbering any marital assets. The order specifically directed that Mother not attempt to access the contents of any safety deposit boxes held in her name until an inventory of the contents could take place. Inventory orders for two separate safety deposit boxes were entered March 20, 2001, and April 30, 2001, respectively.

On August 24, 2001, the trial court entered a temporary custody order, awarding Father primary custody of Blaz and Mother primary custody of Broc on a Sunday–through–Friday schedule. The order also specified that Father and Mother would have custody of both children on alternating weekends. The temporary order was modified on November 30, 2001, to allow Mother additional time during the holidays with Blaz.

The hearing on the dissolution was held during October, November, and December of 2002. Following the denial of Father's motion to re-open the case for further evidence, the trial court issued its judgment for dissolution of marriage on June 16, 2003. Father and Mother were granted joint legal custody of their two children, with Father awarded primary physical custody of Broc and Mother awarded primary physical custody of Blaz. The judgment also included a child visitation schedule (detailed through 2011) for the dates "[t]he non-custodial parent shall have visitation with the child that is in the custody of the other parent[.]" The trial court found the annual income of Father and Mother to be "essentially equal," and neither party was awarded child support (or maintenance),

and each was required to pay one-half of the children's medical insurance.

Throughout the course of the proceedings, each party filed various motions alleging discovery violations. The judgment made reference to rulings on three such motions that were pending. The first motion was a motion for sanctions filed by Mother on December 18, 2001, in which she complained that Father had not fully complied with all discovery requests. That motion was sustained on June 7, 2002, and the order provided that Father's pleadings were to be stricken if full compliance was not achieved in twenty days. Although full compliance did not occur within twenty days, the trial court set aside its order for sanctions on October 24, 2002, which, according to the trial court, left Mother's original motion for sanctions without final resolution. Based on the proceedings, the trial court determined that Father purposely failed to comply with Mother's discovery requests. Therefore, the court sustained Mother's motion, but decided it would not strike Father's pleadings or enter judgment by default. Rather, the court indicated "an adverse evidentiary inference" would be assigned to Father in terms of the property and debt distribution.

The second and third motions referenced in the judgment were both filed by Father on September 9, 2002. On that date, Father filed a motion for sanctions and a motion for contempt, both of which made the same allegations with regard to alleged discovery violations by Mother. The trial court denied both motions, finding them to be without merit. According to the court, Mother's "discovery responses were sent to [Father's] counsel within a reasonable time and since then she has made a practice of updating her discovery response to keep the information requested as current as possible."

Regarding the property distribution, Father was awarded two of three tracts of marital real estate, and Mother was awarded one tract, which was the marital home. Combining the real estate and personal property, but subtracting any debt assigned, Father was awarded assets of approximately *$201,063*. Mother, using similar calculations, was awarded assets valued at approximately $287,279, of which $131,100 was non-marital property. *The value of Mother's marital property was $156,179.*

This appeal follows. Additional facts necessary to the disposition of the points raised by Father and Mother will be presented in the discussion below.

## Discussion

Father raises two points, and Mother raises four points in her cross-appeal. We will address them in the order presented.

*Father's Point I—No exceptional circumstances to justify split custody of the children*

In his first point, Father contends that the trial court erred in splitting custody of the children by placing one child (Broc) with Father and the other child (Blaz) with Mother. According to Father, there were no exceptional circumstances to justify such a custody arrangement.

In its judgment, the trial court noted the following:

Each party requests that he or she be awarded the primary physical custody of the children. The Court must, therefore, according to Section 452.375.6 RSMo 2000, consider and weigh the non-exclusive factors set forth therein:

(1) Each parent believes they should have primary physical custody of the children, but because it is not possible to accommodate the wishes of both, the Court must decide which

parent is best suited to raise the children. The Court, after carefully weighing the evidence, determines that [Mother] should have custody of [Blaz] and [Father] should have custody of [Broc] subject to the Child Visitation Schedule attached, which schedule is incorporated herein by reference.

(2) Considering the close proximity of the physical addresses of the parties and the willingness of the parents to participate in assuring that the children will have meaningful contact with each parent and the other sibling the order of the Court is appropriate.

(3) There have been episodes of marital conflict of varying nature during the marriage which conduct is condoned by the parties by the passage of time.

■ Appellate courts afford greater deference to a trial court's determination of child custody than in any other type of case. *Tracy v. Tracy*, 961 S.W.2d 855, 859 (Mo.App.1998). We will not interfere with the trial court's determination unless a child's welfare compels us to do so, and we may not substitute our judgment for that of the trial court so long as credible evidence supports the trial court's award. *Cross v. Cross*, 30 S.W.3d 233, 235 (Mo. App.2000). The trial court is vested with broad discretion in determining child custody and our principal concern is the same as the trial court's in awarding custody, in that the decision should be made in the best interests of the children. *Tracy*, 961 S.W.2d at 858–59.

■ Father is correct that, absent exceptional or unusual circumstances, Missouri courts do not support the separation of siblings or split custody. *Nichols v. Beran*, 980 S.W.2d 342, 348 (Mo.App.1998). However, it is also well established that the trial court has the authority to order such a custody arrangement if it is in the best interests of the children. *In re Marriage of Newberry*, 745 S.W.2d 796, 797 (Mo.App.1988). There is no absolute set of rules to follow when awarding child custody; each case must be examined in light of its own set of unique facts. *Replogle v. Replogle*, 903 S.W.2d 551, 554 (Mo. App.1995).

■ A split custody award assumes that both parents are "fit parents." *Capehart v. Capehart*, 110 S.W.3d 920, 923 (Mo.App. 2003). If either parent was unfit, the trial court would not have awarded primary physical custody of any of the children to that parent. *Id.* In the case before us, the testimony at trial provides a basis for a determination that both parents were fit. Nearly all witnesses, whether they were called by Father or Mother, testified that both parents were good parents. Any particular witness might testify that one parent was somewhat better than the other or that one parent had provided more overall care for the children, but there was not one witness that was able to conclude that either parent was unfit.

Under the temporary custody award, Father was awarded primary custody of Blaz and Mother was awarded primary custody of Broc. However, in the final judgment, the custody arrangement was switched, and Father awarded primary physical custody of Broc, and Mother primary physical custody of Blaz. At trial, there was much testimony that Mother and Broc had developed a cantankerous relationship and that Broc, sixteen years old at the time of trial, was having some difficulty living under Mother's roof and rules.

■ There was testimony that a couple of weeks before the trial began, Mother and Broc had argued about the amount of

time Broc was spending at activities outside the home. Part of the discussion was also about Broc's overall attitude and anger. Broc left and walked to his Father's home, but prior to leaving he slammed a door with enough force that a mirror fell off the wall in Mother's beauty salon, which is attached to Mother's home, the marital residence. During the argument, Mother admitted to placing her hand on Broc's shoulders and pushing him toward the salon where he had knocked down the mirror.

Broc went to Father's home and did not return for four days, which, according to Mother, was a violation of the temporary custody order that was allowed by Father, as he refused to return Broc to her home. Father admitted that he did not consider it a good idea for Broc to return to Mother's home that evening because Broc was so upset, but that only the first night was a technical violation of the temporary order, because Broc was scheduled to stay with Father that weekend.

During the trial Broc was interviewed by the court, and Broc indicated there was a lot of tension between him and Mother. With respect to the relationship with his brother Blaz, Broc noted that they had a good relationship and that he might enjoy seeing Blaz more, but then also noted that the two "really get at each other" if together too much. Broc agreed with the trial judge that, given the seven-year age difference and the activities associated with someone Broc's age, Broc would not likely spend much time with his younger brother even if they did live in the same household. During the court's interview, Broc did not state a preference for living with Father or Mother.

In a hearing held on February 10, 2003, on Father's motion to re-open for additional evidence, Broc was questioned by counsel for both Father and Mother. Broc spoke about fighting with Mother on a daily basis and that it had become very stressful for both him and Mother for him to live with her. Broc also indicated that the stress affected his relationship with Blaz, in that, according to Broc, Mother did not treat Blaz as she treats Broc. Two or three weeks prior to the hearing, Broc had "basically moved in with [Father]" and was spending a little time with Mother on the weekends, which Broc understood was in violation of the temporary order. Broc told the court that he now would rather live with Father.

Mother and Father also testified at the hearing, with Mother expressing that she was upset that Broc is allowed to use a car while at Father's house. Father testified that he used the car for work because his pickup had over 200,000 miles on it and that, although the 1994 vehicle may be considered Broc's someday, the pickup was Broc's to drive, and it was the only vehicle on which Broc was listed as a driver for insurance purposes. As part of her testimony, Mother admitted that Broc told her that he wanted to live with Father. After hearing the testimony, the court determined that there was not enough evidence to support Father's motion to re-open the case for additional evidence and thus, the motion was denied.

At the trial proceedings in the fall of 2002, the testimony regarding Mother's interaction with Blaz was that the two of them have a very close relationship. Blaz' first-, second-, and third-grade teachers all testified that Blaz was always happy to see Mother when she would come to school on Mondays to check on his academic progress and when she would come to school on Wednesdays to share lunch with him, an arrangement based on the temporary custody order under which Blaz lived with Father during the week. Blaz' teachers also testified that Blaz was an excellent

student, with an A average. Blaz, according to his teachers, always appeared well-adjusted, clean, and well-rested.

Given the overall facts and circumstances of the case, and the testimony at trial, we cannot say that the trial court abused its discretion in determining that a split custody arrangement was in the best interests of the children. Father's Point I is denied.

*Father's Point II—Custody award included restrictive visitation arrangement*

In his second point, Father argues that the trial court erred by restricting Father and Mother's visitation with both children to alternating weekend visitation and one week in the summer. According to Father, this restrictive visitation arrangement denies the non-custodial parent and the sibling "frequent, continuing and meaningful contact" with the other child. Father suggests that adding an overnight stay during the midweek to the non-custodial parent would alleviate his concern.

In the argument portion of this point, Father contends that the trial court's alleged error here was actually that it failed to make requisite findings under § 452.375, RSMo 2000. Specifically, Father indicates that the trial court failed to make written findings specified by § 452.375.4, RSMo 2000, and § 452.375.6, RSMo 2000. Section 452.375.4, RSMo 2000, states:

> The general assembly finds and declares that it is the public policy of this state that frequent, continuing and meaningful contact with both parents after the parents have separated or dissolved their marriage is in the best interest of the child, except for cases where the court specifically finds that such contact is not in the best interest of the child, and that it is the public policy of this state to encourage parents to participate in decisions affecting the

health, education and welfare of their children, and to resolve disputes involving their children amicably through alternative dispute resolution. In order to effectuate these policies, the court shall determine the custody arrangement which will best assure both parents participate in such decisions and have frequent, continuing and meaningful contact with their children so long as it is in the best interests of the child.

Under § 452.375.6, RSMo 2000,

> If the parties have not agreed to a custodial arrangement, or the court determines such arrangement is not in the best interest of a child, the court shall include a written finding in the judgment or order based on the public policy in subsection 4 of this section and each of the factors listed in subdivisions (1) to (8) of subsection 2 of this section detailing the specific relevant factors that made a particular arrangement in the best interest of the child. If a proposed custodial arrangement is rejected by the court, the court shall include a written finding in the judgment or order detailing the specific relevant factors resulting in the rejection of such arrangement.

The above section references subsection 4, but also the factors in subsection 2, § 452.375.2, RSMo 2000, which are as follows:

> The court shall determine custody in accordance with the best interests of the child. The court shall consider all relevant factors including:
>
> (1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;
>
> (2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as

mother and father for the needs of the child;

(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;

(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;

(5) The child's adjustment to the child's home, school, and community;

(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions of law. Custody and visitation rights shall be ordered in a manner that best protects the child and the parent or other family or household member who is the victim of domestic violence from any further harm;

(7) The intention of either parent to relocate the principal residence of the child; and

(8) The wishes of a child as to the child's custodian.

As stated previously, the trial court noted the following in its judgment:

Each party requests that he or she be awarded the primary physical custody of the children. The Court must, therefore, according to Section 452.375.6 RSMo 2000, consider and weigh the nonexclusive factors set forth therein:

(1) Each parent believes they should have primary physical custody of the children, but because it is not possible to accommodate the wishes of both, the Court must decide which parent is best suited to raise the children. The Court, after carefully weighing the evidence, determines that [Mother] should have custody of [Blaz] and [Father] should have custody of [Broc] subject to the Child Visitation Schedule attached, which schedule is incorporated herein by reference.

(2) Considering the close proximity of the physical addresses of the parties and the willingness of the parents to participate in assuring that the children will have meaningful contact with each parent and the other sibling the order of the Court is appropriate.

(3) There have been episodes of marital conflict of varying nature during the marriage which conduct is condoned by the parties by the passage of time.

We agree with Mother that Father raises points in the argument section of his brief that are beyond the issues noted in the point relied on itself. The point relied on defines the scope of the issues raised for review on appeal, and our review is restricted to issues raised in the point relied on. *Rea v. Moore*, 74 S.W.3d 795, 799 (Mo.App.2002).

As noted in Point I, we cannot find that the trial court abused its discretion in determining that split custody was in the best interests of the children. We agree with Father, as was also indicated in the analysis of Point I, that the trial court at least implicitly found that both he and Mother are fit parents.

Given the circumstances of the case, if there was no abuse of discretion in the split custody award, we fail to see how the resulting visitation was necessarily re-

strictive since, as the court noted, "[c]onsidering the close proximity of the physical addresses of the parties and the willingness of the parents to participate in assuring that the children will have meaningful contact with each parent and the other sibling the order of the Court is appropriate." We agree that the custody and visitation arrangement was appropriate. Father's Point II is denied.

*Mother's Point I—Award of $50,000 from safety deposit box to Mother in property distribution*

In Mother's first point in her cross-appeal, she contends that the trial court erred in awarding to her $50,000 from a safety deposit box because those funds no longer existed on the last day of trial. According to Mother, she provided a full accounting for the manner in which she expended the funds, and the funds were spent on legitimate bills and expenses.

■■■■ We will affirm the decision of the trial court in a dissolution case unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Wright v. Wright,* 1 S.W.3d 52, 57 (Mo.App.1999). We will interfere with a trial court's division of property only if the division is so heavily and unduly weighted in favor of one party such that it amounts to an abuse of discretion. *Barnes v. Barnes,* 903 S.W.2d 211, 213 (Mo.App.1995). An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances before it and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *In re Marriage of Collins,* 875 S.W.2d 643, 647 (Mo.App.1994). If reasonable persons can differ about the propriety of the trial court's actions, the trial court did not

abuse its discretion. *Wright,* 1 S.W.3d at 57.

■■■■ In terms of the proper date for valuation of property in a dissolution proceeding, the most appropriate date is considered to be the date of trial. *Id.* If the division of property is not in close proximity to the trial, the valuation date should be the date of the division of property. *Id.*

As noted earlier in this opinion, the trial court, following the filing of the petition for dissolution by Father, entered an order enjoining the parties from selling, transferring, disposing, destroying, or otherwise encumbering any marital assets. The order specifically directed that Mother not attempt to access the contents of any safety deposit boxes held in her name until an inventory of the contents could take place. Inventory orders for two separate safety deposit boxes were entered March 20, 2001, and April 30, 2001, respectively.

The box inventoried on March 20, 2001, is the one at issue here. That safety deposit box contained cash in the amount of $54,995, shares of Wal–Mart stock, and documentation related to the stock. According to the dissolution judgment, the trial court considered the cash amount inventoried at $55,000, with $50,000 awarded to Mother as part of the property distribution. All parties agree that Mother was ordered to give Father $5,000 from that amount for attorney fees.

The trial was held during the months of October, November, and December of 2002. During testimony in October 2002, Mother testified that there was approximately $10,000 left from the funds at that time, that $20,000 went to her attorney and another $20,000 went to pay bills left by Father. According to Mother, a large portion of this was to pay the mortgage for a house in Jonesboro, Arkansas the couple owned, although she admitted that the house was rented at some point and she

received that income for at least part of the time period in question. Later in the trial, Mother testified there was $3,500 left, but by the last day of trial, her testimony was that the funds were completely depleted. She provided the court with documentation of the expenditures from the fund, but the ledger stops when the account had a balance of $18,000, and income generated, such as from the rental property, is not noted in the documentation.

Mother also testified regarding the beginnings of the safety deposit box, which she opened only in her name. The funds placed in the box were from what she earned from the beauty salon. Although the funds were from her earnings, she admitted that she underreported those earning to the Internal Revenue Service ("IRS"). For example, her income in 1998 was $29,463, but Mother only reported $13,559 to the IRS. In 1999, she earned a little over $27,000, but only reported $14,383. She admitted she knew the tax returns were false and were intentionally so, because she wanted more money in that safety deposit box. Mother also admitted that those false tax returns were among the documentation she provided to the court as part of the discovery process.

Mother draws our attention to § 452.315.2(1), RSMo 2000, which states:

As part of a motion for temporary maintenance or support by an independent motion accompanied by an affidavit, either party may request the court to issue an order after notice and hearing:

(1) Restraining any person from transferring, encumbering, concealing, or in any way disposing of any property except in the usual course of business or for the necessities of life and, if so restrained, requiring the person to notify the moving party of any proposed extraordinary expenditures and to account to the court for all extraordinary expenditures made after the order is issued[.]

Mother contends that all of her expenditures, except for some furniture she purchased, fell under the heading of "necessities of life."

 The trial court is in a superior position to judge such factors as credibility, sincerity, and other intangibles that may not be revealed in the transcript. *McCallum v. McCallum*, 128 S.W.3d 62, 65–66 (Mo.App.2003). The trial court here was free to disbelieve Mother's accounting of the expenditures from this fund, particularly in light of its order enjoining her (as well as Father) from selling, transferring, disposing, destroying, or otherwise encumbering any marital assets. *See id.* at 68.

We cannot find here that the trial court abused its discretion in awarding the $50,000 to Mother as part of the property distribution even though she had apparently completely depleted those funds by the end of the trial. Mother's Point I is denied.

*Mother's Point II—Error in setting aside the order for sanctions and not applying an adverse evidentiary inference in property distribution*

In her second point, Mother contends that the trial court erred in setting aside its order for sanctions, which provided for the striking of Father's pleadings and for allowance for Mother to proceed in default. Mother alternatively asserts that, if the action setting aside the order for sanctions was not error, it was an abuse of discretion for the trial court to not follow through in its admonition of Father that the court would apply an adverse evidentiary inference to him in the determination of the division of property and debts.

 The trial court's actions in setting aside the sanctions are reviewed for abuse

of discretion, in that the trial court may exercise its discretion in determining its response to non-compliance with pre-trial discovery issues. *Siller v. Rivituso–Siller*, 129 S.W.3d 433, 436 (Mo.App.2004). In our review, we consider the totality of the circumstances and whether the challenged action resulted in prejudice or unfair surprise. *Id.*

Earlier we outlined the overall property distribution and repeat it here. Father was awarded two of three tracts of marital real estate, and Mother awarded one tract, which was the marital home. Combining the real estate and personal property, but subtracting any debt assigned, Father was awarded assets of approximately *$201,063*. Mother, using similar calculations, *was awarded approximately $156,179 in marital property*. Mother's property distribution included the $50,000 from the safety deposit box addressed in the previous point, which was considered marital property, and $131,100 (primarily Wal–Mart stock) that was considered non-marital property awarded to her.

The trial court indicated in its judgment that although it had set aside the sanctions, it would apply an adverse evidentiary inference in the property distribution. On balance, Mother received over $36,000 more in the property distribution, after accounting for the debt assigned to each party. It was not an abuse of discretion for the trial court to have considered that amount to represent the adverse evidentiary inference it chose to apply to Father. Given the totality of the circumstances, the trial court's actions did not result in prejudice or unfair surprise. Mother's Point II is denied.

*Mother's Point III—Property division greatly favored Father*

In her third point, Mother raises issues with the overall distribution of property and contends that the distribution greatly favors Father. Her overall complaint is a combination of several issues, including that the trial court erred by combining the value of Mother's marital and non-marital assets in making the property distribution and by including the $50,000 from the safety deposit box that had already been expended. The remainder of her point deals with valuations of certain property and that there was not sufficient evidence to support the valuations.

As previously noted, we will interfere with a trial court's division of property only if the division is so heavily and unduly weighted in favor of one party such that it amounts to an abuse of discretion. *Barnes*, 903 S.W.2d at 213. An abuse of discretion occurs when the trial court's ruling is clearly against the logic of the circumstances before it and so arbitrary and unreasonable as to shock the sense of justice and indicates a lack of careful consideration. *Collins*, 875 S.W.2d at 647. If reasonable persons can differ about the propriety of the trial court's actions, the trial court did not abuse its discretion. *Wright*, 1 S.W.3d at 57. It is the duty of the trial court to consider the value of non-marital property to each spouse in its division of marital property, as well as the economic circumstances of each spouse, the contribution of each spouse to the acquisition of property, the conduct of the parties, and custodial arrangement. *Id.* at 59.

First, any complaint Mother has in this point regarding the trial court's actions in awarding her the $50,000 from the safety deposit box has been addressed and will not be further discussed here. Second, as indicated in *Wright*, it is the trial court's duty to consider the value of non-marital property in the overall property distribution. *Id.* Thus, it was not an abuse of

discretion for the trial court to take into account Mother's non-marital property, which consisted primarily of Wal–Mart stock worth $130,000 that had been kept in the safety deposit box with the $50,000 cash.

We next consider Mother's complaints regarding the trial court's valuation of Alton Farm Supply and the beauty salon, as well as the attribution of $20,000 of debt to Father that Mother contends lacked sufficient evidentiary support. Mother is correct that although the trial court has discretion in assigning valuations, evidence must exist to support such valuations. *Wright*, 1 S.W.3d at 57.

The trial court awarded Father Alton Farm Supply and valued it at $50,000, which was derived, according to the court, from a valuation of $100,000 less a business debt of $50,000. Alton Farm Supply was a business that Father and Mother had acquired from his parents. On his property distribution list submitted to the court, Father estimated the value of the business was $95,000. At trial, Father testified that the real estate was valued somewhere between $76,000 and $78,000, with a mortgage on the real estate in the $31,000 to $32,000 range. Father testified that the total debt for the real estate and lines of credit was $78,000. According to Father, the value of the business, above and beyond its debt, was $17,000. When the business was purchased, the couple paid $5,000 to purchase the goodwill of Alton Farm Supply. Thus, Father agreed that the goodwill of the business "approximately tripled."

The only evidence Father provided regarding inventory and equipment of the business was that when he and Mother purchased the business, the contract indicated that $31,500 was paid for inventory. An additional $3,000 was paid for equipment such as bins and bagging equipment, scales, and dollies. According to Father, his valuation of $95,000 for the business took into account not only the valuation of the real estate, but also "incorporate[d] the existing inventory that is at the business[.]"

Mother testified that the total valuation was $192,485, when combining the real estate, inventory, equipment, and goodwill. She valued the real estate at $78,000, the inventory at $50,526.40, the equipment at $48,959, and the goodwill at $15,000. The inventory value was derived by taking the average inventory indicated on five years of tax returns. Mother's equipment value was based on the amount listed for equipment on a December 31, 1999, statement of assets, liabilities, and capital. Mother provided no testimony regarding debt of the business, and although her separate valuation amounts totaled to over $192,000, she testified that she would "consider it to be reasonable to put a value on [the business] of $150,000[.]"

■ Mother also raises issue with the allocation of a $20,000 debt to Father. In its judgment, the trial court specified that Father "shall pay any and all debts and loans owing to his father in the approximate amount of Twenty Thousand Dollars[.]" At trial, Father testified that he and Mother had borrowed $22,000 from his father during the previous ten years. Father admitted there were no promissory notes for the loans, but that the loans were related to the business. With respect to the allocation of this debt to Father, we find there was evidence of its existence in the record and that the trial court did not abuse its discretion in including it within the allocation of debt to Father.

In addition, the numbers seem to indicate that the trial court took this $20,000 debt into account when determining the total debt related to the business. The

trial court noted that its valuation of Alton Farm Supply was $50,000, derived by subtracting $50,000 debt from an overall valuation of $100,000. The only other evidence of debt associated with the business was Father's testimony that total debt, including the real estate and lines of credit, was $78,000. Combining this information, there was evidence from which the trial court could have arrived at a business debt of $50,000.

We share Mother's concern, however, regarding whether the court's valuation included appropriate amounts for inventory and equipment. Mother and Father essentially agreed on the value of the real estate and on the value of the goodwill of the business, $78,000 and $15,000, respectively. Adding to those numbers the evidence before the trial court of inventory and equipment, $50,526 and $48,959, respectively, yields an overall valuation of $192,485. Subtracting the business debt of $50,000 leaves a valuation of $142,485. It is our determination that the evidence supports a resulting valuation of $142,485 for Alton Farm Supply, rather than the $50,000 as indicated by the trial court in its property distribution. Mother's share of the property distribution should increase by one-half of the amount by which the valuation increased, which would yield her an additional $46,242.50.

Mother also complains of the court's valuation of the beauty salon, which was used as her place of business and is attached to the marital home. The court valued it at $5,000. Father estimated the value to be $20,000, which was calculated based on re-establishing at a different location with the necessary inventory, equipment, and fixtures.

Mother testified that there was "nothing there except my chair and mirror, and there are a few supplies there and retail, a shampoo chair." Since the business itself does not own any real estate, Mother's valuation was just of the items in the business, which she estimated was $600.

We cannot find that the trial court abused its discretion in valuing the business at something higher than $600, but yet less than the cost of re-establishing a new business at a location other than at her home. Therefore, there was evidentiary support for the valuation.

Mother's Point III has merit to the extent that the evidence supported a resulting valuation of Alton Farm Supply of $142,485, rather than $50,000. Mother is entitled to one-half of that increase; therefore, Mother's share in the property distribution should be increased by $46,242.50. *This change in valuation results in Mother receiving marital property of $202,421.50 and Father receiving marital property of $247,305.50, which we believe to be fair under the circumstances.*

*Mother's Point IV—Error to award Father principal custody of Broc*

In her final point, Mother contends that the trial court erred in awarding Father primary custody of Broc because it was against the weight of the evidence. Mother raises many issues as to why it was error for Father to receive primary physical custody of Broc, all of which relate to alleged improper inducements Father provided to Broc. Among these improper inducements were Father buying Broc his "dream car" that could only be used when Broc stayed at Father's house, purchasing a four-wheeler that could also only be used by Broc when Broc was at Father's home, and undermining Mother's authority by providing Broc refuge when Broc did not appreciate Mother's rules or discipline.

It is unnecessary for us to address Mother's point as written, based on our analysis of Father's Point I, where we

found that, given the overall facts and circumstances of the case and the testimony at trial, we cannot say that the trial court abused its discretion in determining that a split custody arrangement was in the best interests of the children. Mother's Point IV is denied.

## Conclusion

The case is reversed with respect to the property distribution and remanded to the trial court with directions for it to reallocate property in a manner not inconsistent with this opinion, such that Mother receives an additional $46,242.50. *See In re Marriage of Stamatiou,* 798 S.W.2d 737, 742 (Mo.App.1990). In all other respects, the judgment is affirmed.

RAHMEYER, J., concurs.

GARRISON, P.J., files separate opinion concurring in part and dissenting in part.

GARRISON, P.J., concurring in part and dissenting in part.

I concur with the majority opinion as it relates to Father's appeal and Point IV of Mother's appeal. I also agree with the majority's conclusion that the trial court erred in arriving at the value of Alton Farm Supply. I respectfully dissent, however, from the conclusions of the majority opinion about the remaining issues relating to the division of property. I also do not believe that the division of marital property will be made fair and equitable with the directions to the trial court to add $46,242.50 to the marital property awarded to both Mother and Father by reason of the re-valuation of Alton Farm Supply.

Father was awarded marital property valued by the trial court at $221,063 after deducting debts against the real estate

awarded to him. This included Alton Farm Supply to which the trial court assigned a net value of $50,000, and the Arkansas property with a net value of $36,379. It also included 535 shares of Wal–Mart stock and "Rite Aid bonds & Onyx Roth 136 shares" valued at $44,400 constituting all of the stocks and bonds owned by the parties that were classified by the trial court as marital property. Although there was no promissory note in existence, the trial court ordered Father to pay "any and all debts and loans owing to his father in the approximate amount of [$20,000]." By deducting that "debt" Father was awarded property with a net value of at least $201,063.[1]

In comparison, Mother was awarded marital property with a net value of $156,179. That marital property award included $50,000 of the $55,000 that had been in the lock box, but which did not exist at the time of trial. In addition, Mother was awarded non-marital property valued at $131,100 which included 2600 shares of Wal–Mart stock valued at $130,000. That stock, one-half of which was registered jointly to Mother and her mother and one-half of which was registered to Mother as custodian for her child by another marriage, was purchased with funds inherited by Mother or with money she earned prior to her marriage to Father.

First, I do not believe that Mother should have been charged with the $50,000 from the lock box that no longer existed at the time of trial. As a general rule, if a marital asset does not exist at the time of trial, the trial court cannot value and include that asset in its division of marital property. *Conrad v. Conrad,* 76 S.W.3d

---

1. Father was also awarded all funds in his personal and business checking and savings accounts, but they were neither specifically identified nor were any values assigned to them.

305, 314 (Mo.App. W.D.2002). As an exception to the general rule, where a spouse is found to be secreting or to have squandered marital assets in anticipation of the marriage being dissolved, the court may hold that spouse liable for the value of those assets. *Id.*

"[A] spouse claiming that a marital asset has been secreted or squandered by the other spouse in anticipation of a dissolution proceeding must introduce evidence demonstrating that there existed at some point a marital asset which is being secreted or was squandered." *Farnsworth v. Farnsworth,* 108 S.W.3d 834, 841 (Mo.App. W.D.2003) (quoting *Conrad,* 76 S.W.3d at 315). Once that evidence has been introduced, while the burden of proof remains with the spouse claiming that the other has secreted or squandered the marital asset, "the burden of going forward with the evidence shifts to the other spouse to 'account' for the claimed secreted or squandered asset by presenting evidence as to its whereabouts or disposition." *Id.* (quoting *Conrad,* 76 S.W.3d at 315).

Here, Father contended that Mother had "squandered and expended" what he believed amounted to $70,000 in cash in the lock box, and asked that it be assessed against her in the division of marital assets. He acknowledged knowing that there were large sums of money "stashed" around the house, and sometime around May 2000 he encouraged Mother that they should obtain a safe in which to keep the money. He said that when they counted it there was "right at $70,000" in cash that was put into the safe; that he later discovered that Mother had taken the money out of the safe and placed it in a safety deposit box; and that the cash in the safety deposit box was inventoried as $54,995 on April 23, 2001.

The trial court did not make a finding that Mother had secreted or squandered

any of the money from the lock box. Rather, the trial court awarded Mother "[a]ll of the marital property in her possession as shown on the attached Personal Property Schedule" that included "[c]ash in Safety Deposit Box @ inventory ($55,000.00)" which the court valued at $50,000. The $5,000 variance apparently reflected the fact that the court had ordered Mother to deliver $5,000 of that money to Father for application to his attorney's fees.

Mother admitted at trial that at one point prior to the separation, there was more money either in the safe at home or in the lock box. Prior to the inventory of the lock box she and Father equally contributed to an investment of approximately $46,000 in stocks. Mother's $23,000 for that investment came from money in the lock box and from her beauty salon account. These were apparently the stocks and investments valued at $44,400 awarded to Father as marital property.

With reference to the remaining money, she introduced an exhibit at trial demonstrating her expenditures over the period of June 25, 2001 through July 5, 2002. She testified that Father, with minor exceptions, provided no financial support for eight months before he filed the petition for dissolution. After the petition was filed in January 2001 he stopped providing any money to the family even though he continued to live in the family home until June 24, 2001. In order to pay the family expenses, Mother explained that she had to draw on the "family account" for a while, then had to take money out of her hair salon account, and finally had to resort to the money in the lock box. The expenses she faced during that interval included monthly house payments of $396 on the marital home; payments of $687 on the house in Arkansas that was vacant for a year; health insurance on the family in

amounts that increased over time from $214 to $327 per month (this expense totaled over $4,300 for the family which included Father); $3,668.68 for furniture after Father took items from the home when he moved out including all of the furniture out of the youngest son's room, exercisers, half of the sectional sofa, all of the TV, VCR and DVD equipment, the entertainment center, and the freezer they had just filled with meat. Mother had also expended $25,000 for attorneys fees by the final days of the trial, all of which came from the money in the lock box.[2] Other expenses included approximately $4,700 for counseling, testing and expenses of experts to testify at trial. In addition, Mother had the expenses of groceries, utilities, dental care, automobile upkeep and the other ordinary expenses of living. By the end of the trial, all of the money in the lock box had been expended. There was no evidence that Mother had spent any of the money in the lock box on anything other than that which would be considered ordinary expenses under the circumstances. Similar expenditures have been held to be legitimate expenditures of marital assets. *Farnsworth*, 108 S.W.3d at 842; *Kester v. Kester*, 108 S.W.3d 213, 222 (Mo.App. S.D. 2003); *Kirkwood v. Kirkwood*, 77 S.W.3d 675, 681 (Mo.App. S.D.2002); *Wright v. Wright*, 1 S.W.3d 52, 62 (Mo.App. W.D. 1999). Certainly, there is no evidence that Mother secreted any of the money from the lock box or spent it on extravagant purchases.

The legitimacy of expenditures for such expenses out of marital funds is affirmed by the fact that here Father was not charged with the $16,000 he spent on attorneys fees before the trial was conclud-

ed, which presumably included $5,000 Mother was ordered to deliver to him from the lock box funds for application to his attorney's fees. Inexplicably, Mother, however, was charged by the trial court with the $25,000 she expended from the lock box money on attorney's fees and $3,000 in expenses relating to expert witnesses. A review of the record in this case indicates that the attorney's fees incurred by Mother do not appear to have been unreasonable, especially considering the difficulty encountered by her attorney in attempting to obtain discovery and the time consumed responding to and countering the multifarious contentions, arguments and objections of Father's attorney at all stages of the proceedings. Examples include Father's contention that he should receive one-half of Mother's admittedly non-marital shares in Walmart, and the fact that his failure to comply with discovery requests resulted in numerous motions and court appearances. In fact, Father never did provide discovery concerning some straightforward items including some of the financial records of the business about which there were substantial contentions. Under these circumstances, I am unable to formulate a reasonable answer to the obvious question of why Mother was charged with marital funds spent for attorney's fees while Father was not?

The unfairness of charging Mother with the $50,000 from the lock box is also demonstrated by the fact that although Father was awarded the property in Arkansas, Mother was charged with money spent from the lock box satisfying at least $11,500 in mortgage payments on that property that were not covered by rental

2. This figure is understandable considering the numerous problems with discovery experienced by Mother in this case, and the fact that Father himself had spent $16,000 on

attorney's fees by the early portion of the trial that extended over four days between October 24, 2002 and December 6, 2002.

income.[3] Likewise, the lock box money with which Mother was charged was partially used to purchase stocks that were all awarded to Father.

In my opinion, Mother satisfied her burden in going forward with the evidence to explain the disposition of the money from the lock box. In fact, our Supreme Court has held that it would not be appropriate to order a spouse to reimburse the other spouse for marital funds that had been withdrawn from bank accounts, certificates of deposit and life insurance policies where there was no evidence that they had been secreted or squandered in anticipation of the dissolution. *Hoffmann v. Hoffmann*, 676 S.W.2d 817, 828 (Mo. banc 1984). Likewise, it was held in *Foraker v. Foraker*, 133 S.W.3d 84, 104 (Mo.App. W.D. 2004), that unless the party alleging that the marital assets have been squandered presents evidence of it, no finding of squandering or reimbursement will result. Like the *Hoffmann* and *Foraker* cases, there is no evidence here that Mother has secreted or squandered the lock box money and I believe it was error to charge her with those funds in the division of marital property.

Even though I think it was error to charge Mother with the lock box funds, it would not automatically follow that the division of marital property was erroneous. The trial court has broad discretion in dividing marital property and its decision

in that regard will be interfered with only if the division is so unduly weighted in favor of one party that it amounts to an abuse of discretion. *Kester*, 108 S.W.3d at 218. "The resulting division of marital property need not be equal, although it must be equitable after taking into account the factors enumerated in [S]ection 452.330.1 and any other relevant factors." *Id.*[4]

Aside from Mother's failure to report all of her earnings on income tax returns, which cannot be condoned, the fact is that these parties had accumulated assets largely through Mother's industry, thrift and dedication to that task. The evidence indicated that Father did not share these characteristics of saving money. For example, two years before the trial of this case, Mother gave Father $3,000 he needed in order to keep the farm supply business running, but two weeks later he was wanting to go skiing in Colorado because he needed a "break." There was also evidence that Father left her once before, taking with him $8,000 representing all the money she had saved in a home safe, and that he invested it in his father's name for the benefit of his son by another marriage. Mother never saw that money again. Mother also testified about her attempts to get Father to jointly put money into a savings account. After a few months, she discovered that he had removed the money

---

3. Rental income that provided $49 per month over the mortgage payments did not begin until six months before the conclusion of the trial.

4. Section 452.330.1 provides that the marital property and marital debts shall be divided in such proportions as the court deems just after considering all relevant factors including:

(1) The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods

to the spouse having custody of any children;

(2) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker;

(3) The value of the nonmarital property set apart to each spouse;

(4) The conduct of the parties during the marriage; and

(5) Custodial arrangements for minor children.

he had deposited. Generally, Mother practiced thrift by, among other things, buying clothes at garage sales, canning food, drying clothes outside rather than running a dryer, using an economy car, buying shoes for $10, and buying cheaper groceries. She saw these measures as necessary because Father had insisted that he wanted to retire at age 55, and she was afraid that if she did not accumulate money that was safe from his grasp, he would leave again with the money as he had done before.

I also note that in the division of marital property the trial court assessed a total value of $1,524 to Mother's bank accounts in awarding them to her, but made no finding as to value of "all funds in [Father's] personal and business checking and savings accounts" awarded to him. Additionally, there is no indication that accounts receivable of Alton Farm Supply were considered in valuing and awarding that business to Father, although he testified that at one point in the trial they were $7,000 to $7,500. These obviously would have the effect of increasing the value of the marital property awarded to Father and increasing the disparity between that awarded to him and to Mother by an unknown amount.

Excluding the $50,000 of lock box money that I believe the trial court incorrectly charged to Mother, the trial court awarded her marital property with a net value (after deducting debts also assigned to her) of $106,179. Father, on the other hand, was awarded marital property with a net value of $201,063. This is to be adjusted by adding $46,242.50 in value to the marital property awarded to each. Nevertheless, Father received almost 62% of those marital assets and Mother received just over 38%, a result I believe to be neither fair nor equitable based on the facts of this case.

Granted, Mother also received non-marital property including Wal–Mart stock valued at $130,000, and the trial court is to consider the value of non-marital property set aside to each spouse before equitably dividing the marital property, A court may not, however, consider the non-marital property to such an extent that it has a substantial material impact on the overall division of marital property. *In re Marriage of Woodson*, 92 S.W.3d 780, 785 (Mo. banc 2003); *Foraker*, 133 S.W.3d at 103. Even if the trial court, without saying so, considered the distribution of Mother's admittedly non-marital property in valuing the assets awarded to each spouse, Mother would still only have received $35,116 more in assets than Father. Under the circumstances of this case, to justify the division of marital property ordered by the trial court by reason of Mother's receipt of her non-marital property would result in the non-marital property having a substantial impact on the overall division of marital property contrary to cases such as *Foraker*, 133 S.W.3d at 103.

Finally, I believe that Mother's inability to obtain compliance with reasonable discovery requests should also be considered. During these proceedings, Mother experienced a multitude of difficulties in obtaining responses to discovery requests, especially those relating to the financial records necessary to present all of the relevant evidence to the trial court concerning marital property. Even threats from the trial court were unsuccessful in achieving compliance. An outline of the record is necessary to understand the pervasiveness and continuing nature of those difficulties.

May 29, 2001: Mother served interrogatories and a request for production of documents.

June 12, 2001: Father filed general objections to all of Mother's interrogato-

ries alleging that they were duplicative of earlier discovery provided to Mother's previous attorney.[5]

July 11, 2001: Mother filed a motion for sanctions, noting Father's failure to answer the interrogatories or respond to the request for production and requesting that a specific time be set by the trial court for Husband to comply with the discovery and, upon the failure to do so, to strike his pleadings and enter judgment by default.

August 23, 2001: The trial court denied Father's objections to Mother's interrogatories as well as Mother's motion for sanctions, but entered an order giving Father "30 days to answer."

October 30, 2001: Mother filed another motion for sanctions, noting Father's failure to comply with the earlier order to comply with the discovery requests by September 23, 2001.

December 6, 2001: Mother's attorney faxed a notice to appear on December 11, 2001 to review pending motions in order to expedite their ruling.

December 11, 2001: The trial court denied Mother's motion for sanctions. Mother contends that this denial was based on representations by Father's attorney that the answers to interrogatories and responses to the request for production had been forwarded to Mother's attorney. The record before this court contains a certificate of service signed by Father's attorney certifying that the answers to Mother's interrogatories and responses to her requests for production were mailed to Mother's attorney on November 20, 2001. That certificate was not file-stamped by the clerk of the trial court until December 12, 2001, the day after the trial court was told that the re-

sponses had already been forwarded. In filings with the trial court, Mother's attorney represented that the responses to her discovery requests were not received until December 17, 2001, twenty-seven days after Father's attorney certified that he mailed them.

December 18, 2001: Mother filed yet another motion for sanctions specifying the evasive and incomplete responses to her interrogatories, the fact that Father had still made no written response to the request for production and had, in fact, produced documents in response to only one of nineteen requests.

February 15, 2002: The parties appeared by counsel and the trial court made a docket entry, "Case ordered passed to March 25, 2002 on discovery issues," and that it was "set for trial May 17, 2002."

March 15, 2002: The record before this court contains a certificate by Father's attorney stating that supplemental answers to Mother's interrogatories and to her request for production were mailed to her attorney on March 15, 2002. On the same day, Father's attorney writes Mother's attorney saying that he hoped the responses to the discovery requests were "all that you require," but if not, "please notify me immediately and I will get them to you promptly."

March 20, 2002: Mother's attorney sent a two-page letter to Father's attorney detailing continuing deficiencies in the answers to five interrogatories and ten of the requests for production.

5. Mother was previously represented by another attorney who withdrew with leave of court on April 30, 2001. Her present attorney entered his appearance on May 15, 2001.

March 25, 2002: The record does not indicate that the discovery issues were heard on this date as earlier scheduled.

May 17, 2002: Case was set for trial on July 18, 2002.

May 24, 2002: Mother's attorney writes the trial court outlining his efforts to obtain compliance with their discovery requests and stating that the court took up the motion for sanctions on March 25, 2002 as scheduled, and took it under advisement. It also stated that no additional discovery had been furnished by Father's attorney despite the letter from Mother's attorney of March 20, 2002, specifying the deficiencies in the discovery responses. The docket sheet in the record here does not document that court appearance, but the letter to the court outlining that appearance also requests a ruling on the motion for sanctions and notes that the case is set for trial on July 18, 2002.

June 7, 2002: The trial court signed a memorandum to the attorneys stating, "I am inclined to sustain [Mother's] motion for sanctions. I am granting [Father] 20 days to correct the deficiencies listed in [Mother's attorney's] letter of March 20, 2002. [Father] must cure the deficiencies or otherwise his pleadings will be stricken."

July 11, 2002: Father's attorney filed a certificate that he had mailed supplemental responses to Mother's "Third Set of Interrogatories and Request for Production" on the previous day. The record does not reflect, however, a "Third Set of Interrogatories and Request for Production."

July 15, 2002: The trial court sent a letter on this date (three days before the case was set for trial) to counsel stating: "I have given the parties ample time to prepare this case and would prefer to decide it on the merits. I am granting [Father] another 15 days to complete responses to interrogatories and complete discovery. The parties should realize that foot-dragging only delays the inevitable and the failure to comply may severely [sic] affect what evidence will be received at the final hearing. I would be willing to dissolve the marriage on the scheduled trial date. Other than this option the case is continued."

July 18, 2002: The trial court entered an order setting the case for trial on September 12 and 13, 2002, and also set it for a "review of discovery" on August 1, 2002.

July 23, 2002: Father's attorney signed a certificate that he had on that date mailed supplemental "Answers" to Mother's "Third Request for Production." Again, the record does not reflect that Mother served a "Third Request For Production."

July 29, 2002: Trial court entered an order setting the case for August 12, 2002, and that it would "take up issue of discovery compliance that day."

August 1, 2002: The docket sheet reflects that on this date, Father produced tax returns for 1997, 1998, 1999 and 2000 representing some, but not all, of the documents sought in the request for production.

August 12, 2002: The trial court heard arguments concerning the status of discovery. Mother's attorney outlined the many attempts to obtain discovery, the several instances of Father's attorney ignoring or only partially complying with the discovery requests, and the fact that one area of discovery that had not fully been complied with dealt with financial information about Alton Farm Supply.

Father's attorney acknowledged receiving a letter from Mother's attorney a year earlier giving a clear indication of what she was contending had not been produced in discovery, but characterized the complaints of Mother's attorney about discovery by saying he "can nit-pick and nit-pick and nit-pick me to death on this discovery request." In the course of the arguments, the trial court told Father's attorney that if Father wouldn't turn over the requested records to Mother "it's going to be pretty disastrous for your client," and "[h]e's setting himself up to receive nothing in a default situation." The trial court also told Father's attorney "we're going to get down to brass tacks on this case, and if we don't have this discovery, Mr. Privette, your client is going to be severely prejudiced. He's just going to have to bite the bullet and make these disclosures." Finally, the court said about Father, "I think I've given him a ton of time, and I'm going to give him one last chance." At the trial court's direction, Mother's attorney prepared a list of the deficiencies in Father's discovery responses which also referred to the letter of March 20, 2002 from Mother's attorney to Father's attorney specifying the failures to comply with discovery. The list indicated that Mother had still not received complete answers to four of her interrogatories and seven of her requests for production. In response, Father's attorney made a lengthy explanation contending that he either did not have some of the documents or that they were equally available. He also made an oral objection to one of the requests for production that had been served over fourteen months earlier. The response by Mother's attorney noted the fact that Father had not responded to the requests for production with an affirmative statement that he did not have the documents requested. Eventually, the trial court told the attorneys that discovery requests needed to be complied with, and Father's attorney said that they would do so in five days if that was what the court wanted.

August 21, 2002: Father's attorney filed a certificate indicating that on August 20, 2002, he had mailed supplemental answers to Mother's interrogatories.

September 12, 2002: The trial court reset the case for trial on October 24–25, 2002.

October 23, 2002: Father's attorney filed a certificate that he had mailed additional supplemental answers to Mother's interrogatories.

October 24, 2002: This was the first day of trial. Father's attorney filed a "Motion to Set Aside Order of June 7th or for Order Finding Discovery Complied With." The Order of June 7, 2002, had ordered Father to fully comply with Mother's discovery requests within twenty days or "his pleadings will be stricken." In arguing Father's motion, Mother's attorney called the trial court's attention to the fact that there still had not been complete compliance with their discovery requests, and in particular documents relating to Alton Farm Supply. Inexplicably, the trial court sustained that motion, but did not indicate what relief was being granted.

This chronological history of the attempts by Mother's attorney to obtain discovery places in perspective a finding made by the trial court in its judgment at the conclusion of the trial. It said:

[Mother's] Motion For Sanctions, filed in this case on December 18, 2001, complaining that [Father] had not fully complied with all discovery request, [sic] came before this Court and was a topic of argument on several different occasions and was finally, on June 7, 2002, sustained so as to provide for the striking of all of [Father's] pleadings unless full compliance was achieved within 20 days of that date, which it was not. Nevertheless, this Court, wishing to resolve the issues in this contested case on the merits rather than by default, set aside the Order for Sanctions on October 24, 2002, leaving that Motion without final resolution. *During the course of the trial of this cause it became apparent the extent to which [Father] purposely failed to comply with [Mother's] discovery, particularly when it came to producing his business records, and thus [Mother], and this Court, were left to speculate about critical issues in this case which would have otherwise been made certain. It is also clear [Father] had possession or access to the records requested and intentionally refused to produce them for examination and evaluation. This Court, therefore, once more sustains [Mother's] Motion for Sanctions but will not now strike [Father's] pleadings or enter Judgment against him by default, but will assess and assign to him, in the determination of the division of the parties' property and debts an adverse evidentiary inference.* (emphasis added).

The division of property as entered by the trial court here is hardly the result of the "adverse evidentiary inference" promised by the trial court. Father's intentional discovery failures not only created substantial expense to Mother and delay in the proceedings, but also, as the trial court found, left it and Mother to speculate about critical issues in the case.

I am unable to conclude that, considering Father's actions in the marriage as well as Mother's industry and thrift, that the division of marital property as fashioned by the trial court was equitable or fair. In my opinion, a fair and equitable distribution of marital property alone would have been for the value of the distribution to be essentially reversed, i.e. Mother would receive at least 60% and Father not more than 40%.