In re the Marriage of: Claire Noland–Vance and Brent Vance,

Claire NOLAND–VANCE,
Petitioner–Appellant,

v.

Brent VANCE, Respondent–Respondent.

No. SD 28699.

Missouri Court of Appeals,
Southern District,
Division One.

July 30, 2010.

Motion for Rehearing or Reconsideration and Transfer Denied Aug. 23, 2010.

Application for Transfer Denied Oct. 26, 2010.

Frederick G. Thompson, IV, Kansas City, MO, for Appellant.

Edward C. Clausen, Jefferson City, MO, for Respondent.

JEFFREY W. BATES, Judge.

In this dissolution action, the trial court determined that the marriage between Claire Noland–Vance (Mother) and Brent Vance (Father) was irretrievably broken

and then decided issues relating to child custody, visitation, child support, division of marital property, attorney's fees and guardian ad litem (GAL) fees. In Mother's seven points on appeal, she challenges all of the trial court's decisions on the aforementioned issues other than the finding that the marriage was irretrievably broken. Finding no merit in any of Mother's allegations of error, we affirm the trial court's judgment.

## I. Standard of Review

■ In this court-tried case, our review is governed by Rule 84.13(d). *In re Marriage of Denton*, 169 S.W.3d 604, 606 (Mo.App.2005).[1] This Court must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *In re Marriage of Dolence*, 231 S.W.3d 331, 333 (Mo.App.2007).[2] In assessing the sufficiency of the evidence, we examine the evidence and the reasonable inferences derived therefrom in the light most favorable to the judgment. *In re McIntire*, 33 S.W.3d 565, 568 (Mo.App. 2000). It is not this Court's function to retry the case. *Souci v. Souci*, 284 S.W.3d 749, 753 (Mo.App.2009). "This is because credibility of witnesses and the weight to be given their testimony is a matter for the trial court, which is free to believe none, part, or all of the testimony of any witness." *In re Marriage of Colley*, 984 S.W.2d 163, 166 (Mo.App.1998). On appeal, we defer to the trial court's credibility determination. *Souci*, 284 S.W.3d at 753. "An appellate court exercises extreme caution in considering whether a

1. All references to rules are to Missouri Court Rules (2009). All references to statutes are to RSMo Cum.Supp. (2005) unless otherwise specified.

2. *Murphy* interpreted the provisions of former Rule 73.01(c). The provisions of that rule were transferred, in essentially the same form, to Rule 84.13(d) effective January 1, 2000.

judgment should be set aside on the ground that it is against the weight of the evidence and will do so only upon a firm belief that the judgment was wrong." *Simpson v. Strong*, 234 S.W.3d 567, 578 (Mo.App.2007). The phrase "weight of the evidence" means its weight in probative value, rather than the quantity or amount of evidence. *Nix v. Nix*, 862 S.W.2d 948, 951 (Mo.App.1993). The weight of the evidence is not determined by mathematics, but depends on its effect in inducing belief. *Id.*

 Because a trial court is vested with considerable discretion in determining custody questions, an appellate court should not overturn the trial court's findings unless they are manifestly erroneous and the child's welfare compels a different result. *In re C.N.H.*, 998 S.W.2d 553, 557 (Mo.App.1999). "We will not substitute our judgment for that of the trial court so long as credible evidence supports the trial court's beliefs." *A.B.C. v. C.L.C.*, 968 S.W.2d 214, 219 (Mo.App.1998). This Court presumes the trial court awarded custody in the child's best interests based upon the court's superior ability to assess the credibility of the witnesses, along with their character, sincerity, and other intangibles not completely revealed by the record. *In re Marriage of Sisk*, 937 S.W.2d 727, 730 (Mo.App.1996); *Baker v. Baker*, 923 S.W.2d 346, 347 (Mo.App.1996). Greater deference is given to a trial court's decision in matters involving child custody than in any other type of case. *In re D.M.S.*, 96 S.W.3d 167, 171 (Mo.App.2003); *In re Marriage of Berger*, 950 S.W.2d 307, 310 (Mo.App.1997).

### III. Discussion and Decision

Because of the number of different issues presented by Mother's appeal, the relevant facts will be presented in connection with our discussion of the points on appeal. These facts have been summarized in accordance with the above-described standard of review.

### Point I

Mother and Father married in July 1986 and separated in early June 2005. Mother's petition for dissolution was filed on June 3, 2005. The case was tried on April 3–5, 2007. Six children were born of the marriage. Their names and ages as of the time of trial were: Elle, 19; Elise, 18; Deanie, 16; James, 14; John, 12; and Diane, 9 (hereinafter referred to collectively as the children and individually by their first names).[3] Until the parties' separation, the children lived in the family home in Jackson County, where they were homeschooled. After the separation, Mother moved with the children to her parents' home in Camden County. Mother is a licensed attorney who practiced sporadically during the marriage. As of the time of trial, she was employed as a real estate broker by Saaman KC LLC (Saaman) in Kansas City. This company was owned in part by Rand Setlich, Mother's paramour. Father was generally employed throughout the marriage. At the time of trial, he was working for the CoStar Group in Kansas City.

When Mother filed for dissolution, she alleged that Father had abused her and the children. In mid-June 2005, the trial court appointed J. Christopher Allen to represent the children as the GAL. After a hearing in July, the court entered a full order of protection enjoining Father from abusing or threatening to abuse, stalk or disturb Mother. The court also granted Mother temporary custody of the children

**3.** Prior to trial, both Elle and Elise legally changed their surnames from Noland–Vance to Noland.

and ordered Father to pay child support. The court further ordered the parties undergo psychological evaluations and allowed Father to visit the children only through supervised counseling sessions.[4] The court ordered the psychological evaluations to be conducted by Dr. Alan Aram (Dr. Aram) and the supervised counseling sessions to take place with Karen Harms (Harms) in Springfield, Missouri. Mother was ordered by the court to keep the GAL advised of the children's residential address and educational arrangements.

In the remaining months of 2005, Father's supervised visitation did not take place. Mother did not fully cooperate with either Harms or Dr. Aram. Mother also did not keep the GAL updated with the children's residential address and educational arrangements. In a January 2006 hearing, Mother took the position that she had not violated any of the court's orders. The trial judge, however, determined that Mother had violated the court's orders. The court again ordered Mother to cooperate with Dr. Aram and the GAL. The court also warned Mother that, if she did not cooperate with a newly selected psychologist in Kansas City to facilitate visitation, the court would transfer the case to juvenile court and have the three youngest children placed into foster care so that Father would have the opportunity to exercise his supervised visitation. Despite the court's warning, no supervised visitation took place in January, February or March 2006.

On March 28, 2006, the court held a hearing on Father's motion for visitation and temporary custody.[5] By this time, Dr. Aram had completed the court-ordered psychological evaluations of the parties and was called as a witness by Father's counsel. The following is a summary of his testimony.[6]

Dr. Aram, a clinical psychologist who had been practicing since 1990, regularly performed court-ordered child custody evaluations. Dr. Aram had interviewed Father, Mother, Elle and James. The doctor also reviewed available records, including medical records; performed various diagnostic testing; and interviewed other individuals identified by the parties. Dr. Aram's written evaluation was admitted in evidence at the hearing.

With respect to Mother's allegations of abuse, Dr. Aram determined that there had been domestic abuse between Father and Mother. Dr. Aram was able to confirm that Mother had suffered a black eye once as a result of Father's abuse. Father acknowledged that his conduct had been reprehensible, and he obtained marital counseling after the incident. Dr. Aram also identified other isolated incidents of domestic abuse in which Mother had been the aggressor.

---

4. At the July 2005 hearing, the court also addressed Father's motion to transfer venue of the case to Jackson County where he lived and the children had lived until the separation. Mother opposed the motion, and it was overruled. Later, Mother moved with the children back to Jackson County. This added travel time and other logistical difficulties and expenses to the litigation.

5. The court also heard Mother's motions to disqualify the judge and the GAL for cause. Both of these motions were ultimately denied.

6. Before Dr. Aram testified about his findings, he expressed concern that Mother would file a disciplinary complaint against him. Dr. Aram expected such a complaint because Mother is "prone to exaggeration of selective memory, is emotionally invested in the case, as would be expected, and has a history of bashing," which he generally defined as "saying negative things ... that, in [his] opinion, were unwarranted" about a person with whom she disagrees.

Dr. Aram found no credible evidence, however, that Father had physically abused the children. Although Mother and the children made such allegations, Dr. Aram noted that the children mentioned the same litany of facts as Mother and used phraseology similar to hers.[7] Dr. Aram also observed that Mother overstated or exaggerated facts to support her version of events that purportedly occurred. For example, Mother recounted an incident in which she claimed to have been paralyzed for a number of hours as a result of Father's abuse five or six years earlier. Her medical records for that time period, however, did not mention any such paralysis. Dr. Aram opined that Mother's allegations of child abuse were mistaken, but sincere. As a consequence of Mother's mistaken belief that abuse had occurred, she sincerely believed Father posed a danger to the children. Dr. Aram opined that Mother would do everything in her power to keep the children from Father "with a near religious zeal." By doing so, Dr. Aram opined that Mother was emotionally abusing the children by alienating their affections for Father. Moreover, Mother's alienating behavior was constant and consistent. While Mother claimed to encourage the children to be loving and respectful toward Father, Mother admitted that she never said anything positive about Father to the children.[8] Similarly, neither Elle nor James had anything positive to say about Father, except that James did say that he wished his Father would "change." Dr. Aram concluded that Mother's constant negativity towards Father, by berating him in front of the children and inciting their fear of him, had caused the children to suffer severe trauma. Relying

upon literature in the field, Dr. Aram explained that there were ten indicators of parental alienation. All ten indicators were present in this case. Dr. Aram described this situation as the worst case of parental alienation he had ever seen. As a mandatory reporter of child abuse, Dr. Aram believed he was required to report this form of emotional abuse to the court.

Dr. Aram diagnosed Mother as having an adjustment disorder not otherwise specified (NOS) that resulted in the alienation of the children from their father in a high-conflict marriage and divorce. The doctor further found maladaptive personality traits based on high levels of defensiveness, dramatic expression of emotions, and "all good or all bad thinking." According to Mother's response to certain testing, she projected an excessively positive self-image. For example, Mother believed she had made no mistakes during the marriage, could have done nothing better and had no weaknesses. Because Mother believed she had done nothing wrong, Dr. Aram opined that she would likely neither seek nor benefit from counseling. Mother's prognosis for changing her alienating behavior was poor. Given Mother's history of a lack of cooperation with court orders, even when faced with the threat of losing the three youngest children to foster care, the doctor admitted he did not know what else would stop Mother from alienating the children from Father.

Dr. Aram also testified about his findings concerning Elle, James and Father. With respect to Elle, Dr. Aram found that she had strongly aligned herself with Mother against Father. The parental alienation affecting Elle was so severe that

---

7. Dr. Aram questioned the children's allegations in this case because he believed the children had been seriously affected and influenced by Mother's negative statements about Father.

8. For example, Dr. Aram testified that Mother told his secretary before her appointment that Father was a "liar." In addition, Mother reported to Dr. Aram that her children believed Father was "the best liar in the world."

Dr. Aram opined her relationship with Father was likely irreparable.[9] With respect to James, on the other hand, Dr. Aram found some indication that the child wanted to reconnect with his father. With respect to Father, Dr. Aram diagnosed him as having an adjustment disorder NOS and a history of unwarranted aggression/temper outbursts toward Mother in a high-conflict marriage. The doctor recommended that Father attend individual counseling to help him better learn to control his temper and support him during these "difficult and probably discouraging times to come."

Dr. Aram concluded his testimony by opining that the severe parental alienation caused by Mother's behavior made Father's contact with his children problematic. If the amount of contact between Father and children was increased, Dr. Aram feared they would misinterpret Father's actions and perhaps even "scream abuse." Nevertheless, Dr. Aram believed there was some hope for a renewed relationship among Father, James and the other two youngest children. Dr. Aram recommended supervised visitation, perhaps with a parent coordinator, to protect Father from false allegations by the children. The doctor also recommended that something be done quickly because further delay supported the parental alienation.

After listening to Dr. Aram's testimony, the court noted that this was the fourth motion from Father requesting visitation. The court planned to confer with the Juvenile Officer to appoint someone new to supervise the children's visitation with Father, which the court anticipated would start immediately.

Despite the court's efforts, however, virtually no supervised visitation took place during the next 11 months. More hearings on this issue were held in June 2006, August 2006, January 2007 and February 2007. During this time period, Mother was difficult to contact by mail or telephone. She moved approximately 40 times and was represented by five different attorneys. By the time of trial in April 2007, Father had received only 30 minutes of supervised contact with the children since June 2005. In addition, by April 2007 the court had entered five separate temporary visitation orders throughout the course of the case.

During discovery, Father served Mother with a written request for admissions. Pursuant to Rule 59.01(a), each of the matters was deemed admitted because Mother failed to respond. Accordingly, Mother admitted that she failed to comply with the trial court's orders requiring Mother to: (1) attend counseling with Harms; (2) attend the evaluation with Dr. Aram; (3) produce certain documents in January 2006; and (4) make herself available to the GAL, Harms, Dr. Aram and others. Mother also admitted that: (1) Father was fit to have custody of the minor children; (2) Mother had shoplifted personal items from a store in 2004; (3) Mother had moved to Camden County without intending to reside there; (4) while the children were present in the same residence, Mother had shared a bed with Rand Setlich on one occasion and with Steve Townsend on another occasion; and (5) Mother had physically abused James and called him derogatory names.

The trial commenced on April 3, 2007. That day, the judge learned Mother had failed to comply with a local rule requiring her to complete parenting classes prior to trial. Mother's attorney asked the court to waive the requirement. The request was denied, and Mother was required to

---

9. For example, Dr. Aram described an incident in which Father had bought Elle a CD as a gift, which she described as "controlling and threatening" behavior by him.

provide proof before the trial concluded that she had scheduled and paid for the parenting classes.

Mother's case-in-chief evidence consisted of the testimony from: Dr. Steven Adelman (Dr. Adelman), an expert witness; Mother; her sister; friends and neighbors; a visitation supervisor; a social worker; a former teacher; and daughters Elle, Elise and Deanie. Father's evidence consisted primarily of his testimony and a number of exhibits. The exhibits included: a letter from the parties' pastor, Tim Buzan (Pastor Buzan), who provided marital counseling to the parties; and several voice mails that Father received from James after he moved with Mother to her parents' home in June 2005. The GAL presented evidence in the form of his own testimony. The court also conducted in-camera interviews of James, John and Diane. The following is an overview of the evidence presented relevant to the custody issue.

Mother's expert, Dr. Adelman is a clinical psychologist who evaluated James, John and Diane. Dr. Adelman did not believe the children were suffering from parental alienation syndrome because they kept repeating the same story, like children who had witnessed something that really frightened them. Dr. Adelman believed the children had experienced trauma, but he could not identify any specific triggering event. On cross-examination, when asked how the court could differenti-
ate between trauma and parental alienation, Dr. Adelman explained that it is "[v]ery difficult, because the symptoms are so similar."

Mother produced several witnesses who testified primarily about instances of Father's abusive behavior toward Mother and the fact that she never said anything negative about Father in front of the children.[10] None of the witnesses possessed any personal knowledge that Father had ever abused the children. Mother acknowledged that she and the children had moved approximately 40 times, staying with families and moving into homes made available through her paramour. Mother testified that she did so because she feared Father. Mother detailed several instances in which Father abused Mother (including the one incident in which she sustained a black eye) and other instances in which Father abused the children. Elle, Elise and Deanie also described incidents of abuse by Father.[11] None of these children had anything positive to say about Father. Each older daughter testified that she had no happy memories of Father, that he had no redeeming qualities at all, and that he was generally a bad or evil person. All three testified that they wanted to protect the younger children from Father and that they would physically take the younger children to keep them away from him. Despite Mother's description of the three older daughters as "obedient," Mother ad-

---

10. One of the witnesses was Mother's sister, Cynthia Dunbar. She testified that she had never heard Mother speak negatively of Father in front of the children. In a later portion of her testimony, however, Dunbar testified that Elle was in the room with Dunbar and Mother while they were talking about things Father had done wrong so they could make a list. One event discussed in Elle's presence and placed on the list was that Father purportedly had left Elle alone when she was four months old and had not apologized for the incident.

11. With respect to Father's physical abuse of the children: Elle testified Father hit her, twisted her arm and smacked her a lot. Elise testified that Father would hit her, twist her arm, throw her to the ground and pin her up against the wall. Deanie testified that Father grabbed her, squeezed and twisted her arms, pushed her down stairs, pulled her hair and kicked her. All three children testified that Father would do this when they tried to prevent Father from abusing Mother.

mitted that she could not guarantee they would obey Mother's orders not to kidnap the younger children if custody was awarded to Father.

Father testified at length on his own behalf, and most of his testimony starkly contrasted with Mother's evidence. Father did admit that he struck Mother in the fall of 1999 and gave her a black eye. Father testified that the incident followed a "three-day rant" in which Mother denigrated him in front of the children. Father was picking up laundry in a closet when Mother followed him, screaming obscenities at him. Father told Mother to back off, and she spit in his face. Father responded by striking Mother in the face. Father testified that he was so mortified at his actions, he asked Mother for a divorce because he "didn't want to be in a marriage where that [behavior] was even possible."

Father also recounted incidents in which Mother was the aggressor in physically abusing Father by biting, slapping, punching, scratching and spitting on him. Father testified that, on one occasion, Mother placed a knife to Father's throat and said, "Have you ever heard of crimes of passion?" During a marital counseling session with Pastor Buzan, Mother admitted that this last-mentioned incident had, indeed, occurred.

Pastor Buzan wrote a letter, which was admitted at trial as Exhibit Z, summarizing his experiences with the parties during their counseling sessions. In the letter, the pastor discussed incidents of domestic abuse between the parties:

> Brent admitted to the "black eye" incident. Claire admitted she regularly verbally berated him and how he didn't "make as much money as he could, emo-

tionally neglected her, and his negative physical looks." The transition to Brent working in town and being home regularly had not gone well. Claire felt Brent didn't help around the house or support her, and Brent felt disrespected and that Claire "controlled" every aspect of the kids' lives, down to their names and painting him in an unfavorable light with the children.

> Prior to my counseling experience with Brent and Claire, there were alleged acts of violence. During the time I was personally involved in counseling, there were no acts of violence or aggression from Brent. There was a session in which Brent had a fat lip and Claire admitted she had hit him. There was a session in which Brent said Claire had threatened him that week with a kitchen knife. Claire said she was kidding but admitted, "maybe I did like the fear it made you feel."

Pastor Buzan's letter also stated that Father had remained in the church during the dissolution proceeding and "conducted himself becomingly, choosing to defend himself very little." Father's continued involvement with the church, however, "enrages" Mother. "She reported that she has 'spoken to eight different pastors and they can't believe we haven't dealt with him.' She now concludes that I am 'a heretic and the church is in heresy.'" [12]

The trial court also admitted in evidence an audiotape containing eight voice mails from James, as well as written transcripts of those messages. The voice mails were left by James on Father's telephone between June 1–3, 2005, which was shortly after Mother had moved the children from the family home to her parents' home in

12. The pastor's letter also noted that other parishioners contacted by Mother had expressed concern to Pastor Buzan over Mother's "vitriolic attacks" on Father. In addition, a school administrator who called Pastor Buzan "was alarmed at how [Mother] was talking about [Father] in front of the [three youngest] children."

Camden County. In the voice mails, James pleaded with Father to come and get him, but to not let the others know that James had called because he would "get in trouble." James also said he loved Father and that John wanted to come home, too. The text of the voice mails are set out below:

1. June 1, 7:02 p.m.: "Hey Dad, this is James. I'm at the lake. Please come get me ... and ... when you get here, tell them I didn't tell you to come. Alright. Please come. Bye."

2. June 1, 8:04 p.m.: "Dad, this is James. Please check your voice mail and then come and get me either today or tomorrow and don't call back, don't call back cause I get in trouble Lord, I mean Dad. Please come and get me. Please, Please come and get me. Don't tell them that I told you to come. Please just come and get me today or tomorrow, please ... and John ... he wants to come home too. Bye, Love you."

3. June 1, 8:44 p.m.: "Hey Dad, this is James, I just talked to Elle and she said that you were doing something with Mom tonight ... I don't know what's going on and it's making me confused and eh, I, I don't feel good and there's just something that doesn't feel right ... um ... Just keep your phone on. Bye."

4. June 2, 9:31 a.m.: "Hey Dad, this is James. I was just calling to tell you that Di, last night, had a headache and she was really sick and stuff ... and to tell you to call a couple times today at Nana and Papa's phone or somethin' just to check in cause it looks like I'm gonna have another hard day trying to get the phone and as far as I hear Mom's coming down here tonight. She's gonna sleep here and in the morning she's gonna go and finish up her classes

and then I'll see you tomorrow night ... John misses you, we all do ... er ... Well not the girls. Deanie thinks you're an ass. Alright, well I love you."

5. June 2, 10:32 a.m.: "Hey Dad, this is James. I just got off the phone with Mom and she said that she's not gonna be able to come tonight but she ... [sigh] I guess I'll see you tomorrow night. Love you, Bye. No need to call back, until tonight. OK ... Bye."

6. June 2, 8:02 p.m.: "Hey Dad, this is James. We just got back from miniature golf. Um ... I was calling to pray with you, but I guess I can talk to you tomorrow. Um, goodnight, love you, love Mom. Bye."

7. June 3, 8:52 a.m.: "Hey Dad, this is James. We're staying here tonight. Please come and get me! Please come and get me! Thanks, Bye. Please, Please, Please come and get me!"

8. June 3, 11:34 a.m.: [crying] "Dad, this is James! You gotta come and get me! Please come and get me! Nana's filing some charges so you can't, so please just hurry! Get this voice mail! Please!"

After Father rested, the three youngest children were interviewed under oath and on the record. During James' interview, he denied that he had really wanted to see Father as stated in the above-referenced voice mails. According to James, he just wanted "to get back home to all my things and friends." James also said he was "not physically able" to visit Father because James could not "stand the memories coming back." James had nothing positive to say about Father. Neither did John or Diane, who both referred to Father as "Brent." After the three younger children were interviewed, they were escorted to

the judge's chambers where they stayed with a juvenile officer.

The GAL was the last to testify and make his recommendation to the court. As a result of the GAL's investigation, he concluded that the children have been severely traumatized by parental alienation syndrome and not by any physical abuse from Father. The GAL based this conclusion on his experience with the children, Dr. Aram's report and Pastor Buzan's letter. With respect to Pastor Buzan in particular, the GAL noted that the parties had confided in Buzan as their pastor. Father and Mother had disclosed instances of domestic violence between themselves, but there were no accusations of child abuse by Father. The GAL also opined that this case tracked exactly with what one would expect to see with parental alienation syndrome, particularly the "objectification of the spouse as all bad." As the GAL explained:

> [T]he insistence upon the negative aspects of the spouse's character and behavior coupled with the inability to see existing or even potential positive traits of the spouse are manifestations of an alienating attitude. Such a client appears to objectify this spouse as an evil thing, no longer a person with at least a few redeeming qualities. There is a loss of ambivalence, which characterizes healthy human relationships. Indeed such objectification of the spouse as all bad should be taken as a sign of significant disorder in a client himself.

To preserve any relationship with Father, the GAL recommended that a split custody arrangement be adopted by the court. The GAL asked the court to transfer custody of the three younger children to Father and order custody of the three older children to remain with Mother. Because of abduction threats made by the older children, the GAL also recommended that Mother only have supervised visitation of the three younger children.

At the conclusion of the trial, the court orally announced its decision on custody. The court determined that it was in the best interest of James, John and Diane to be immediately placed in Father's custody. A temporary order of custody and visitation was put in place.

In July 2007, the court entered its judgment. In assessing the credibility of the witnesses, the court considered "their sincerity and character, as well as the history of events and actions of parties throughout the course of the entire case." With respect to Mother's allegation that she had been abused by Father, the court found that each party had committed domestic violence upon the other spouse. The court also found, however, that Mother's description of the abuse committed by Father had been exaggerated by Mother, the children and Mother's other witnesses. With respect to Mother's allegation that the children had been abused by Father, the court did "not find credible the testimony that [Father] has physically abused the children." The court further explained that "[b]ecause of [Mother's] alienation of the children's affections towards [Father], the Court gives little weight to what the children have stated to the [GAL], third parties and the Court during in camera testimony."

With respect to custody, the court decided that Elle was emancipated. Mother was awarded sole legal and physical custody of Elise and Deanie. Father was awarded sole legal and physical custody of James, John and Diane. The court made the factual findings required by § 452.375.2 to support this split-custody arrangement. The court made a specific finding that "all the children have been alienated from their father by their mother. [Mother] engaged in purposeful be-

havior to accomplish this end." The court also found that Mother's alienating conduct and behavior was "especially egregious and has been injurious to the children and [Father]." The court was also "firmly convinced that [Mother] will never follow the Court's orders so that [Father] can have a relationship with his children or work to repair the damage that has been done." The court also relied upon Dr. Aram's conclusion that it was unlikely individual counseling would change Mother's alienating behavior. The court further found that the "three oldest children have deep seated animosity and hostility toward their father and this has caused the three younger children to be unjustifiably afraid of [Father]." Accordingly, the court concluded that "split custody of the children is required to salvage any hope of a relationship between [Father] and the three youngest children."

The court adopted its own parenting plan because each party had requested sole custody of all of the children. In determining visitation, the court "reluctantly" concluded that Elise and Deanie would "only have a relationship with [Father] if they voluntarily choose to do so." With respect to James, John and Diane, the court allowed Mother to have supervised visitation of up to two hours per week at Mother's cost. The judgment authorized additional supervised visitation at such times as the parties might agree.

▇▇▇ In Mother's first point, she contends the trial court erred by awarding sole legal and sole physical custody of James, John and Diane to Father. Moth-er argues that the trial court's ruling is not supported by the evidence or is against the weight of the evidence for two reasons.[13] This Court disagrees. The relevant factors a trial court must consider when determining custody are set out in § 452.375.2, which states:

> The court shall determine custody in accordance with the best interests of the child. The court shall consider all relevant factors including:
>
> (1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;
>
> (2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;
>
> (3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;
>
> (4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;
>
> (5) The child's adjustment to the child's home, school, and community;
>
> (6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved. If the court finds that a pattern of domestic violence has occurred, and, if the court also finds that awarding custody to the abusive parent is in the best interest of the child, then the court shall enter written findings of fact and conclusions

---

**13.** Mother's first point also charges the trial court with error because it failed to determine that Mother was unfit, which she claims is necessary because she had been awarded temporary custody. Because this allegation of error was not developed in the argument portion of Mother's brief, it is waived. *See In re K.A.C.*, 246 S.W.3d 537, 547 (Mo.App. 2008); *Boyd v. Boyd*, 134 S.W.3d 820, 824 (Mo.App.2004). In addition, Mother's assertion that the award of temporary custody to her required the trial court to find a change of circumstances or Mother's unfitness before Father could be awarded custody is simply wrong. *See Replogle v. Replogle*, 903 S.W.2d 551, 556 (Mo.App.1995); *D.K.L. v. L.C.L.*, 764 S.W.2d 664, 666 (Mo.App.1988).

of law. Custody and visitation rights shall be ordered in a manner that best protects the child and any other child or children for whom the parent has custodial or visitation rights, and the parent or other family or household member who is the victim of domestic violence from any further harm;

(7) The intention of either parent to relocate the principal residence of the child; and

(8) The wishes of a child as to the child's custodian.

The fact that a parent sends his or her child or children to a home school, as defined in section 167.031, RSMo, shall not be the sole factor that a court considers in determining custody of such child or children.

§ 452.375.2(1)–(8). In the court's judgment, it made extensive factual findings on all of these factors, which are summarized below.

The court found that first factor did not favor either party because both sought sole legal and physical custody of all of the children. Based on the "exceptional and unusual circumstances" in this case, the court decided that a split custody arrangement was in the children's best interests.

The court found that factor two favored Father because:

[Mother] does not want the children to have a frequent, continuing or meaningful relationship with [Father]. [Mother] does not want [Father] to perform the function of a father to the children. [Mother] is willing to actively perform her function as a mother to the children. [Father] wants a frequent, meaningful and continuing relationship with all the children. Due to the actions of [Mother], he has not maintained a frequent, meaningful or continuing relationship with the children. At the present time, [Father] does have the ability to actively perform his function as a father to the

minor children. This Court finds that the children have been wrongfully deprived of any contact with [Father] by [Mother]. If [Mother] receives custody of the children, [Father] will have no relationship with them. If [Father] receives custody of the children, he is more likely to allow [Mother] to have a continued relationship with the children.

As noted above, Mother was awarded custody of Elise and Deanie. Father was awarded custody of James, John and Diane. The court found that factor three favored a split custody arrangement because:

The interaction and relationship between the children and [Mother] is very close. The children also have good interaction and a good relationship with each other. The interaction and relationship between the children and [Father] is poor, to say the least. The Court is well aware that, absent exceptional or unusual circumstances, Missouri law does not support the separation of siblings, but that the Court has authority to award such a split custody arrangement if it is in the best interests of the children.

The Court heard testimony from all six children. In her case in chief, [Mother] called the three oldest children, Elle, Elise and Deanie to testify. The Court conducted in camera interviews of the three youngest children, James, John and Diane. The Court observed all six children as they testified. They are all extremely bright, intelligent and articulate children.

The glowing way in which the children perceive their mother, and the way in which they uncritically describe her as being the perfect parent stands in stark contrast to their descriptions of their father. The three oldest girls were exceptionally derogatory towards their fa-

ther. When asked by the [GAL] to tell one redeeming quality of [Father], they could not give an answer. The three oldest girls denied anything positive in their relationship with [Father] to an unnatural extreme. The three youngest children were very articulate to the point of sounding rehearsed in their testimony. They seemed like "little adults." The two youngest children, John and Diane, ages 12 and 9 respectively, referred to [Father] as "Brent," which was disturbing given their young ages. The three youngest children did their best to mimic the extreme hatred toward their father as shown by the three oldest children. The children's negative view of their father is out of all proportion to reality.

Of primary importance to this Court was [Father's] Exhibit S which contained voice mail recordings from [Father's] cell phone made by the oldest son, James. James called [Father] at the beginning of the separation of the parties when all the children were at their grandparents' house, James and Janice Noland, in Camden County. James did not know that the children were not coming home to the marital residence in Jackson County. James called [Father's] phone eight (8) times over three days and left messages on his voice mail. This is evidence of James' close relationship with his father. He asked his father repeatedly to come to Camden County and pick him up so he could return home. He expressed his love for his father during each call. He was not fearful of [Father]. On the last call, James was crying and very emotional and begged [Father] to come and get him. He stated that "Nana", Janice Noland, was filing some type of "charges" so that [Father] could not pick him up. James clearly wanted to be with his father and the Court considered this evidence as very credible. In his words

and actions James did not act as though he had been subjected to extensive abuse as described by [Mother] and the three older children. James' attitude toward his father has changed and been influenced by the conduct of [Mother] and the three oldest girls.

The oldest daughter, Elle, stated that she would intervene and take the three youngest children to keep them away from their father if he were granted custody or visitation. The second oldest daughter, Elise, stated that she would discourage the children from following a court order to see their father and she also stated, "I would take them away." [Mother] testified that she has heard the three oldest children vow to protect the younger children and take them away. She further testified that they are smart, capable children and just might "pull it off." She stated that the three older girls would obey her completely, but she wasn't sure that they wouldn't take the three younger children.

It was clear to the Court that the three oldest children have deep seated animosity and hostility toward their father and this has caused the three younger children to be unjustifiably afraid of [Father]. The three oldest children have been greatly influenced by [Mother] and her mother, Janice Noland. The three oldest children have disregarded the court's orders for supervised visitation and even failed to follow the order during trial to not discuss their testimony with each other. It was clear that Elle and Elise had discussions with Deanie before she testified on the second day of trial. The testimony of the three youngest children indicated that they were influenced by the older siblings.

The children have extended family on both sides but have had no contact with [Father's] family for almost 2 years. [Mother] has introduced a man to whom

she is romantically involved into the children's lives. This is contrary to their best interests.

The Court finds that split custody of the children is required to salvage any hope of a relationship between [Father] and the three youngest children. This statutory factor requires that a sole legal and sole physical custody arrangement with [Father] being designated as the sole legal and sole physical custodian for the three youngest children to accomplish the best interests of those children. Because the three oldest children did not follow the Temporary Orders of this Court for even supervised visitation with [Father] and due to their ages, 19, 18 and 16, this Court reluctantly believes that they will only have a relationship with [Father] if they voluntarily choose to do so. To serve the best interests of the two oldest girls, Elise and Deanie, [Mother] shall be designated as the sole legal and sole physical custodian of those children.

The court found that the fourth factor strongly favored Father because:

This Court entered *five* separate Temporary Visitation Orders throughout the course of this case. All the orders were pursuant to the [GAL's] recommendation for supervised visitation for [Father] with the children. The Court continued modifying the orders to meet the needs of the parties, including changing supervisors of the visits as [Mother] moved to different locations. With each Temporary Order, [Mother] and/or the children would have an excuse why that particular order could not or would not be followed. The testimony at trial was that [Father] has had the sum total of only 30 minutes supervised contact with the children since June, 2005.

This Court is firmly convinced that [Mother] will never follow the Court's orders so that [Father] can have a relationship with his children or work to repair the damage that has been done. Further evidence of [Mother's] blatant disregard for this Court's orders is her refusal to follow 26th Judicial Circuit Local Rule 68.7 which requires both parents to attend a parent education program to learn how to avoid possible detrimental effects on children brought upon by dissolution cases. On the first day of trial [Mother] stated that she had not completed the program during the almost two year period of time this case has been pending. [Mother] requested the Court waive the requirement. Her request was denied. It was approximately one month later after trial that [Mother] filed her certificate of completion of the required program.

The Court heard testimony and received the psychological evaluations of Dr. Alan Aram, Psy.D. His evaluations were marked as an exhibit and sealed in the Court's file. Dr. Aram was able to evaluate [Mother and Father] and interview two children, Elle and James. Dr. Aram concluded, as did this Court, that [Mother's] allegation of [Father's] unilateral "beating and terrorist coercion and threats of abuse and death" were not supported by the information he received. If [Mother] has custody of the children, the "prognosis is poor" for [Father] to have a normal relationship with the children (see Page 32 of Dr. Aram's report). This Court is convinced that all the children have been alienated from their father by their mother. [Mother] engaged in purposeful behavior to accomplish this end....

The fifth factor dealt with the children's adjustment to the child's home, school and community. With respect to this factor, the court made the following finding:

The facts which would support this are somewhat unknown because [Mother] has failed to follow the Orders of this

Court regarding advising the [GAL] of the children's circumstances, including but not limited to, education and place of residence. Furthermore, the children have each made unfounded complaints to the Missouri Bar Association alleging that the [GAL] has failed to perform his duties. [Mother] and the children have intentionally failed to keep the [GAL] informed because they are mad at him because he has not followed their wishes for no visitation with their father. The Court finds attorney J. Christopher Allen has performed his duties as [GAL] pursuant to the Standards set forth by the Missouri Supreme Court. As [GAL] he must advocate the children's best interest rather than merely seek to follow the children's wishes.

Furthermore, the Court was able to determine from the evidence that the older children have been home schooling the three younger ones. [Mother] did not submit any evidence of their current academic status.

[Father] testified he will have the children tested to determine their current academic status and educational needs, if any. The factor favors [Father]. It is in the best interests of the children to establish and maintain a stable home and school environment, if possible. For the three younger children, [Father] will be able to do that.

With respect to the sixth factor, the trial court made several pertinent findings which were based upon its assessment of the credibility of the witnesses and what weight should be accorded to various parts of the conflicting evidence. The court found Mother and Father had engaged in a "pattern of domestic violence" with each other, but the extent of any physical abuse of Mother by Father had been exaggerated by Mother, the children and Mother's witnesses. The court also found that there was no credible evidence of any physical abuse of the children by Father

and that "[Mother] has kept [Father] from having any meaningful contact with the minor children since the parties separated, contrary to this Court's previous five (5) Orders and Judgments. [Mother] has attempted to and in all likelihood has successfully, alienated the affections of the children towards [Father]." Finally, the court believed Dr. Aram's testimony that: (1) Mother has "maladaptive personality traits with high levels of defensiveness, dramatic expression of emotion and all good/bad thinking"; and (2) the "prognosis is poor" for individual counseling to change the "psychological diagnosis that underly [Mother's] alienating behavior[.]"

The seventh factor weighed in Father's favor because:

[Mother] has moved the children on 40 occasions while this matter was pending. She failed to provide any notice to [Father] or the [GAL] of her whereabouts. [Mother] failed to keep the [GAL] advised of her current address as ordered by the Court. [Father] intends to reside in Kansas City metropolitan area and has not indicated any intent to relocate the principal residence of the minor children.

The eighth factor dealt with the wishes of the children as to their custodian. The court decided this factor was neutral because:

There is no credible evidence as to the wishes of the children regarding custody before the Court. Because of [Mother's] alienation of the children's affections towards [Father], the Court gives little weight to what the children have stated to the [GAL], third parties and the Court during in camera testimony.

To support reversal of the judgment under Point I, Mother advances two different arguments. We will address each in turn.

Mother's first argument is that the trial court failed to consider the children's best interests, as required by § 452.375.2, because the court wrongly found that Mother had alienated the children's affections toward Father and that he had not abused the children. To support this argument, however, Mother relies only upon the evidence favorable to her and ignores all of the evidence tending to support the trial court's decision. The gist of Mother's argument is that both the trial court and this Court are required to accept as true all of the evidence which Mother presented. Mother's argument ignores the applicable standard of review, which this Court is duty-bound to follow. The issues below were hotly contested, and the trial court was presented with conflicting evidence on nearly every subject. "Great deference must be given to the trial court's resolution of conflicts in evidence, and [an appellate court] gives due regard to the court's opportunity to have judged the credibility of the witnesses before it." *MC Development Co., LLC v. Central R-3 School Dist. of St. Francois County,* 299 S.W.3d 600, 602 (Mo. banc 2009). Accordingly, this Court defers to the trial court's credibility determinations and the weight assigned to witness testimony. *In re Marriage of Dolence,* 231 S.W.3d 331, 333–34 (Mo.App.2007). "The trial court is free to believe all, none, or part of the testimony of any witness." *Youngberg v. Youngberg,* 194 S.W.3d 886, 889 (Mo.App.2006). This includes even uncontradicted testimony. *Selby v. Smith,* 193 S.W.3d 819, 824 (Mo. App.2006). Mother's argument would require us to ignore the credibility determinations made by the trial court, as well as its resolution of conflicts in the evidence. This we cannot do. *Buschardt v. Jones,* 998 S.W.2d 791, 796 (Mo.App.1999); *Hankins v. Hankins,* 920 S.W.2d 182, 188 (Mo. App.1996); *K.J.B. v. C.A.B.,* 883 S.W.2d 117, 121–22 (Mo.App.1994).

When the evidence favorable to the trial court's decision is considered, as it must be, it is clear that the finding as to Mother's alienation of the children's affection toward Father was supported by the evidence. Of "primary importance" to the court was Father's Exhibit S, which contained the voice mail recordings from Father's cell phone that were left by James just after moving with Mother to her parents' home in Camden County. The court determined that these voice mails were:

> evidence of James' close relationship with his father.... He expressed his love for his father during each call. He was not fearful of [Father].... James clearly wanted to be with his father and the Court considered this evidence as very credible. In his words and actions James did not act as though he had been subjected to extensive abuse as described by [Mother] and the three older children.

We reject Mother's argument that James made these calls only because "he wanted to go back to Kansas City to be with his friends and games ... [and] he was bored at his grandparents' house." It was up to the trial court to decide what weight to give the voice mail recording. We defer to the trial court's superior ability to assess the credibility of the witnesses, along with their character, sincerity and other intangibles not completely revealed by the record. *In re Marriage of Sisk,* 937 S.W.2d 727, 730 (Mo.App.1996); *Baker v. Baker,* 923 S.W.2d 346, 347 (Mo.App.1996). The trial court's finding of parental alienation by Mother also was supported by Dr. Aram's testimony, Pastor Buzan's letter, and the findings and recommendations of the GAL. The foregoing evidence amply supports the trial court's decision. "We will not substitute our judgment for that of the trial court so long as credible evidence supports the trial court's beliefs." *A.B.C. v. C.L.C.,* 968 S.W.2d 214, 219 (Mo.App.

1998). Mother's argument that the trial court's decision is against the weight of the evidence fares no better. After carefully reviewing the entire trial record, this Court does not have a firm belief that the judgment was wrong. *Simpson v. Strong*, 234 S.W.3d 567, 578 (Mo.App.2007). The trial court's best interest finding is supported by the evidence and is not against the weight of the evidence.

■ Mother's second argument is that the trial court erred by awarding Father sole legal and sole physical custody of James, John and Diane. The trial court considered a joint custody arrangement, but it found that joint custody was inappropriate due to Mother's unjustified failure to communicate with Father:

> [Mother] claims [Father] has engaged in domestic violence toward her and the children. [Mother] maintained that is the primary reason for not communicating with [Father] about the children. Furthermore, [Mother] insisted none of the children wanted any contact with their father and she allowed their wishes to control. Regarding the allegations of domestic violence, [Mother] failed to present any credible evidence of these assertions. The Court gives further analysis when discussing the case in light of Section 452.375[.2], RSMo., included herein. Therefore, [Mother's] failure to communicate with [Father] was unjustified and not in the best interest of the children.

The court further found that Mother failed to keep Father informed as to any information concerning the children's health, education or welfare. The court concluded that, because of Mother's failure to communicate with Father about the children, joint physical custody and joint legal custody were not appropriate. For the same

reasons as set forth in the above finding, the court found the second and third possible joint custody arrangements (joint physical/sole legal and joint legal/sole physical) were similarly inappropriate. The court decided that the appropriate custody arrangement was to award sole legal and physical custody to Father.[14]

Mother argues that the trial court's findings are insufficient to show that it chose the appropriate custody arrangement, as required by § 452.375.5. According to Mother, the trial court should have awarded joint legal and physical custody of James, John and Diane to both parents. The premise of this argument is that the trial court erred by finding that "[r]egarding the allegations of domestic violence, [Mother] failed to present any credible evidence of these assertions." Mother argues this initial finding under § 452.375.5 is inconsistent with the court's later best interests finding under § 452.375.2 when the court specifically found "domestic violence has occurred with these parties." Mother then spends ten pages of her brief recounting testimony from her witnesses concerning this domestic violence.

In response, Father argues—and this Court agrees—that Mother has misinterpreted the trial court's finding. The court's initial finding under § 452.375.5 that Mother failed to produce any "credible evidence of domestic violence" related only to the issue of whether Father had committed domestic violence against any of the children. Based upon this finding, which turned on the credibility of the respective witnesses on this issue, the court then found that Mother's refusal to communicate with Father based on false allegations of child abuse was unjustified. This finding is entirely consistent with the

**14.** The fifth potential custody arrangement was not at issue because there had been no requests of third party custody or visitation.

**418**

court's later best interests finding under § 452.375.2 that "Mother failed to produce any credible evidence regarding domestic violence towards the children." The court also was very clear in finding that domestic violence had occurred with "these parties," which referred exclusively to Mother and Father. Based upon our thorough review of the record, the court's finding that Mother failed to produce any credible evidence regarding domestic violence by Father toward the children is supported by substantial evidence and is not against the weight of the evidence. The only witnesses who testified to such alleged abuse were Mother and the children. Given the court's finding of extreme parental alienation in this case, the court gave "little weight" to the testimony of the children or Mother. It was well within the trial court's discretion to accept or reject all, part or none of the testimony it hears. *In re Marriage of Eikermann*, 48 S.W.3d 605, 608 (Mo.App.2001). This Court defers to the trial court's assessment of witnesses' credibility. *K.J.B. v. C.A.B.*, 883 S.W.2d 117, 121–22 (Mo.App.1994). None of Mother's other witnesses had any personal knowledge that Father had abused any of the children. Because the challenged finding is adequately supported by the evidence and is not against the weight of the evidence, Mother's argument that the trial court failed to award the appropriate cus-

tody arrangement pursuant to § 452.375.5 fails.[15] Mother's first point is denied.

### Point II

In Point II, Mother contends that, "[e]ven assuming the trial court's finding of alienation was correct," the trial court misapplied the law in splitting custody and separating the three youngest siblings from the three older siblings. She argues the trial court's order "violates Missouri public policy and law favoring preservation of sibling relationships and physical community."[16] The facts necessary for the disposition of this point have already been presented in connection with our discussion of Point I.

Mother is correct that "absent exceptional or unusual circumstances, Missouri courts do not support the separation of siblings or split custody." *In re Marriage of Barton*, 158 S.W.3d 879, 884 (Mo. App.2005). "However, it is also well established that the trial court has the authority to order such a custody arrangement if it is in the best interests of the children." *Id.* "There is no absolute set of rules to follow when awarding child custody; each case must be examined in light of its own set of unique facts." *Id.*; *Durbin v. Durbin*, 226 S.W.3d 876, 880 (Mo.App.2007). Here, the trial court specifically found that a split custody arrangement was in the children's best interests based upon the

---

15. Mother also challenges the court's findings that: (1) Mother allowed the children's wishes to control; (2) Mother failed to communicate with Father; and (3) Mother failed to disclose the children's school/health information. Mother relies, however, only upon evidence favorable to her in challenging these findings. Obviously, Mother's evidence was contradicted by Father's evidence, which the trial court found to be credible. On appeal, this Court not only defers to the trial court's assessment of witnesses' credibility, but accepts the trial court's resolution of conflicts in the evidence. *K.J.B.*, 883 S.W.2d at 121–22.

Accordingly, Mother's additional challenges fail.

16. Mother also argues that the temporary custody order required the trial court to find a substantial change of circumstances before switching custody from Mother to Father. Mother's temporary custody award was just that—temporary, awaiting a full hearing on that issue. Father was not required to prove a change in circumstances in order to be awarded custody after a trial on the merits. *See* n. 13, *supra.*

exceptional and unusual circumstances in this case.

Mother primarily relies on the exceptional circumstances in *Barton* and *Durbin, supra,* in which the appellate courts upheld separation of siblings where there were little or no meaningful relationships between siblings, and they had an opportunity for visitation. *See Barton,* 158 S.W.3d at 884 (upholding split custody award of son, age 16, to father and custody of son, age 11, to mother); *Durbin,* 226 S.W.3d at 880 (upholding split custody award of daughter, age 16, to mother and custody of sons, ages 12 and 10, to father). Mother argues the case at bar is distinguishable because the evidence showed that all six siblings were unusually close, the older sisters were like second mothers to the younger siblings, and no visitation was available. Accordingly, Mother asserts that the trial court misapplied the law by separating the siblings. This Court disagrees.

■ First, Mother ignores the trial court's finding that the older siblings were a negative influence on the younger siblings by causing them to be "unjustifiably afraid" of Father and further alienating their affections for him. In this particular respect, the three older daughters were behaving much like Mother. With respect to James, the court found that, since June 2005, the boy's "attitude toward his father has changed and been influenced by the conduct of [Mother] and the three oldest girls." The court also found that the "three youngest children did their best to mimic the extreme hatred toward their father as shown by the three oldest children." The court further found the "three youngest children were very articulate to the point of sounding rehearsed in their testimony. They seemed like 'little adults.'" This Court recognizes that "[a] child's interrelationship and interaction with his or her siblings are relevant factors to consider in custody decisions." *Scott v. Steelman,* 953 S.W.2d 147, 150 (Mo.App. 1997). "However, those factors must be weighed and balanced in light of an overriding concern for the best interests of the child." *Id.*

■ Second, Mother ignores other exceptional circumstances to support separation of siblings, which include alienation of a child's affection for a parent. "Alienation of a child's affection and interference with visitation are grounds for a major custody change...." *Ellis v. Ellis,* 747 S.W.2d 711, 715 (Mo.App.1988); *see Cornell v. Cornell,* 809 S.W.2d 869, 874 (Mo. App.1991); *Gentry v. Simmons,* 754 S.W.2d 579, 582 (Mo.App.1988). Separating older and younger siblings because of mother's alienation of affection towards the father was upheld in *Garrett v. Garrett,* 464 S.W.2d 740 (Mo.App.1971), the facts of which are remarkably similar to those in this case. In *Garrett,* mother repeatedly denied father visitation, and by the time of trial, the two older children's affections toward their father had "been so seriously alienated that it would be unwise to transfer custody to him." *Id.* at 744. The trial court believed, however, "that before [mother's] bitterness towards [father] ... should be permitted to further permeate the feelings of the two younger children and permanently alienate their affections for [father], it would be to their best interests and welfare that their custody be placed with the father...." This Court determined that the "discretion of the trial court was wisely exercised in this cause" and affirmed the court's split custody determination. *Id.* We reach the same conclusion here.

Finally, Mother argues that the court's order was punitive in nature and intended to punish Mother and the three older children. In *Garrett,* this Court reminded the parties "that custody rights are not meted

with a design to reward one parent or punish the other, that each child custody case must be judged on its own facts, and that parental rights are secondary to determining what will best serve the welfare of the children, which is always our primary concern." *Id.* at 743 (citations omitted). In *Garrett*, like this case, this Court is convinced that the trial court's primary concern was the children's best interests. Mother's second point is denied.

## Point III

■ In Mother's third point, she contends the trial court erred in granting her supervised visitation with the three youngest children. Once again, the facts necessary for the disposition of this point have already been presented in connection with our discussion of Point I. Visitation requirements are governed by § 452.400. In relevant part, this statute states that "[a] parent not granted custody of the child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would endanger the child's physical health or impair his or her emotional development." § 452.400.1(1). The public policy of Missouri is for a child to have "frequent, continuing and meaningful contact with both parents after the parents have separated or dissolved their marriage ... except for cases where the court specifically finds that such contact is not in the best interest of the child." § 452.375.4.

Here, the trial court specifically found that "[t]he best interests of the three youngest children require that they have no contact with [Mother], unless that contact is supervised and restricted." With respect to Mother's supervised visitation, the Court explained that "[g]iven the fact that this Court has absolutely no faith that

[Mother] would return the children to [Father] if it granted her visitation rights, the three older children have threatened to kidnap the three younger children and [Mother] has indicated an inability to control the older children's conduct, no unsupervised visitation is set aside to [Mother]." The court stated that, "[p]ursuant to Section 452.400, RSMo., the Court finds that unsupervised visitation with [Mother] would further impair the emotional development, endanger the physical health of the three youngest children and would make the custodial transition set forth herein impossible to accomplish." In Parenting Plan B-1, the court specified that "Mother shall have the right to periods of physical custody of the minor children as the parents may agree is in the best interest of the children." The court further specified:

> In the event the parents cannot agree on a specific physical custody schedule, then the physical custody schedule shall be as follows: a. Mother shall have supervised visitation up to 2 hours per week by a person or agency designated by Father, the same to be at Mother's cost, if any.

Mother argues that the trial court erred in restricting her visitation because "there was no evidence suggesting a need for supervised visitation." [17] This Court disagrees. The trial court made a specific finding that it had no confidence Mother would return the three younger children to Father if unsupervised visitation were permitted. In addition, the trial court relied upon evidence presented at trial that the older girls would kidnap the three younger children and keep them from Father, if given the opportunity. The trial court's

---

**17.** In Mother's point, she also claimed error because "the court did not weigh the parties' disparate incomes and [Mother's] ability to pay the cost of supervised visitation." Because Mother presented no argument in her brief to support this allegation of error, it was abandoned. *See In re Marriage of Michel,* 142 S.W.3d 912, 919 n. 3 (Mo.App.2004).

decision to only permit Mother to have supervised visitation addressed both of these very legitimate concerns. Thus, there is ample support in the record for the trial court's decision. *See, e.g., In re G.P.C.,* 28 S.W.3d 357, 366 (Mo.App.2000) (where there was evidence that paternal grandmother had threatened to kidnap grandchild, trial court's decision to permit two hours of supervised visitation with grandparents every three months was affirmed).[18] Thus, the trial court did not err in awarding Mother supervised visitation. *Id.* Mother's third point is denied.

## Point IV

■ Mother's fourth point posits error in the trial court's determination of how much Mother should pay as child support. At trial, Father introduced evidence that Mother earned $58,118 in 2006. That figure came from Exhibit E, which was Mother's 1099 form from her employer, Saaman. Mother testified that she had earned an additional $8,800 in 2006 from another source. Thus, Mother's gross income for 2006 totaled $66,918 or $5,576 per month. Mother also testified that, as of the date of trial in April 2007, she was earning $3,250 per month plus additional commission income from the sale of real estate. Mother had borrowed approximately $16,000 against her future commission earnings. She estimated that she was earning enough commission income to pay off her debt by the end of 2007. However, Mother also testified that she might be able to have that debt paid off by the fall of 2007. In order to pay off a debt of $16,000 by the end of the year (nine months), Mother had to be earning commission income of approximately $1,777 per month. When added to Mother's base salary, her monthly income in 2007 would be approximately $5,027 per month. In order to pay off a debt of $16,000 by fall (six months), however, Mother had to be earning commission income of approximately $2,666 per month. When added to Mother's base salary, her monthly income in 2007 would be approximately $5,916 per month. The trial court decided that, for the purpose of calculating child support, Mother's monthly income was $5,576 (her 2006 gross income figure). Both parties were ordered to pay child support to the other, with the net result being that Mother owed Father $735 per month.

Mother contends the trial court erred in awarding child support based on her monthly income of $5,576. According to Mother, her testimony established that her 2007 income was no greater than $3,250 per month. Based upon that premise, she argues that the trial court's use of a higher gross monthly income amount lacked evidentiary support and was based upon speculation. This Court disagrees.

■ We begin by noting that it was up to the trial court to resolve conflicts in the evidence on this issue. "This court does not determine what the trial court could have found; instead, it determines whether the trial court's actual finding is unsupported by substantial evidence or against the weight of the evidence." *McCoy v. Scavuzzo,* 250 S.W.3d 1, 9 (Mo. App.2008). "Past, present and anticipated earning capacity may be properly considered in determining the ability of a parent to pay child support." *Fulton v. Adams,* 924 S.W.2d 548, 554 (Mo.App.1996); *McCoy,* 250 S.W.3d at 8. Mother's own testimony showed that she earned a gross amount of $5,576 per month in 2006. Past earnings are indicative of present earning capacity. *Pearcy v. Pearcy,* 193 S.W.3d 844, 847 (Mo.App.2006). Therefore, the

18. *In re G.P.C.* was overruled on other grounds by *Barker v. Barker,* 98 S.W.3d 532, 534–35 (Mo. banc 2003).

trial court's use of Mother's 2006 gross earnings to calculate child support was well within the trial court's discretion. *Pearcy*, 193 S.W.3d at 847. The trial court was entitled to rely on the 2006 figure as predictive of what Mother could currently earn as of the date of trial in April 2007. *Fulton*, 924 S.W.2d at 554. In addition, Mother's own testimony established that her estimated 2007 salary and commission income would between $5,027 and $5,916 per month. The $5,576 per month figure chosen by the trial court to calculate child support is within this range. It was up to the trial court to decide what part of Mother's testimony about her 2007 earning was credible. *Mayben v. Garren*, 286 S.W.3d 854, 858 (Mo.App.2009). At a minimum, however, Mother's assertion on appeal that her 2007 income was no greater than $3,250 per month was flatly contradicted by her own trial testimony in which she gave the court a ballpark estimate that her earnings "would be—monthly—I think between—Oh, about 5,000." The trial court's determination of Mother's earning capacity for the purpose of calculating child support is supported by substantial evidence and is not against the weight of the evidence. Mother's fourth point is denied.

## Point V

■ In Mother's fifth point, she contends the trial court erred in its distribution of the parties' marital property and debts. The marital assets consisted of the parties' home in Kansas City, its contents, the parties' vehicles and their bank accounts. During the course of these proceedings, the parties' home in Kansas City went into foreclosure. At the foreclosure sale, the home was purchased by Mother's employer, Saaman. The proceeds were eventually transferred to the Camden County Circuit Clerk to be held in trust by the court. After paying the expenses associated with the foreclosure, the remaining balance from the foreclosure of the marital home was approximately $48,923. The parties' other marital assets and liabilities were listed in Father's Exhibit A–1, which was admitted in evidence and attached to the judgment.[19] The value of the automobiles, household and personal goods, bank accounts and other items listed in Exhibit A–1 totaled $39,362. Combined with the remaining balance from the home foreclosure, the value of the parties' marital property was $88,285.

■ Father and Mother had jointly incurred two debts that totaled $55,200. The debts incurred by Father totaled $4,814 in credit card debt. The debts incurred by Mother totaled $42,005. These were comprised of: (1) credit card debt of $32,019; (2) a tax debt of $9,986; and (3) debts in unspecified amounts to Macy's, Saaman and Mother's parents.[20] Thus, the parties' ascertainable debts totaled $102,019.

As is evident from the foregoing calculations, the parties' debts exceeded their assets by the amount of $13,734. It was up to the trial court, in the exercise of its sound discretion, to decide how to equitably divide the martial property and debt between Father and Mother. In addition, the court made specific findings that: (1)

19. Mother did not submit an income and expense statement of her own for the trial court's consideration.

20. In Mother's argument, she attempts to inflate the marital debts allocated to her by including her attorney's fees, the share of Father's attorney's fees she was ordered to pay and the GAL fees she was ordered to pay.

These litigation expenses are not properly includable as part of the marital debts to be divided by the trial court. The assessment of attorney's fees is governed by § 452.355 RSMo (2000) and is the subject of Mother's sixth point on appeal. The assessment of GAL fees is governed by § 452.423.5 and is the subject of Mother's seventh point on appeal.

"[Mother's] conduct while this matter has been pending has placed a substantial financial burden upon [Father] and [the court] has taken the same into consideration of its division of property and allocation of debts"; and (2) "[Mother's] conduct and behavior have alienated the children from their father and this conduct is especially egregious and has been injurious to the children and [Father]."

The trial court awarded Mother marital property totaling $37,597. This was comprised of three automobiles valued at $10,000; household goods in Mother's possession valued at $11,600, and $15,997 from the foreclosure proceeds. Mother was allocated the following debts: (1) her tax debt of $9,986; and (2) her credit card debt of $32,019. Thus, Mother was allocated debts totaling $42,005.[21] The debts allocated to Mother exceeded her assets by $4,408.

The trial court awarded Father marital property totaling $50,688. This was comprised of: (1) a motor vehicle valued at $500; (2) personal property valued $17,262; and (3) the $32,926 remaining balance from the foreclosure of the marital home. Father was allocated the following debts: (1) his credit card debt of $4,814; and (2) the parties' $55,200 in joint debt. Thus, Father was allocated debts totaling $60,014. The debts allocated to Father exceeded his assets by $9,326.

■ Mother contends the trial court abused its discretion in dividing the parties' marital property and debts because the court allocated "virtually all of the marital property to [Father] and virtually all the marital debt to [Mother]." This Court disagrees. The division of marital property is left to the sound discretion of the trial court, and its decision will be upheld unless an abuse of discretion is shown. *Colabianchi v. Colabianchi,* 646 S.W.2d 61, 64 (Mo. banc 1983); *In re Marriage of Michel,* 142 S.W.3d 912, 920 (Mo.App.2004). "Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Anglim v. Missouri Pacific Railroad Co.,* 832 S.W.2d 298, 303 (Mo. banc 1992).

■ "The division of marital property need not be equal, but must only be fair and equitable given the circumstances of the case." *Nelson v. Nelson,* 25 S.W.3d 511, 517 (Mo.App.2000). In the case at bar, the parties' debts exceeded their assets by about $13,734. Father was allocated approximately 59% of the debt, and Mother was allocated approximately 41% of the debt. While Father received more of the marital assets, that was offset by the greater amount of marital debt allocated to him. We find no abuse of discretion in the trial court's division of the marital assets and debts. Mother's argument that Father got all of the assets and Mother got all of the debt is simply not supported by the record. Mother's fifth point is denied.

*Point VI*

■ Mother's sixth point deals with the trial court's assessment of attorney's fees pursuant to § 452.355 RSMo (2000). As of the date of trial, Father had incurred $64,608 in attorney's fees. Mother had

---

**21.** The court also ordered Mother to pay her debts to Saaman and her parents. Because the amount of these debts is unknown, there is no information in the record from which this Court can ascertain whether the allocation of these debts to Mother had any material impact on the trial court's distribution of the marital assets and debts.

incurred $60,800 in attorney's fees. Father requested that Mother be required to pay all of his attorney's fees. The trial court made a specific finding that Mother's conduct during the dissolution action had placed a substantial financial burden upon Father. As the court noted in its judgment, the attorney's fees generated by the litigation "were substantially in excess of what should have been required to bring this matter to conclusion. [Mother] is the primary reason Father's attorney fees and the [GAL] fees are so high." The trial court ordered Mother to pay $25,000 of Father's attorney's fees. Mother contends this ruling was an abuse of discretion because the court failed to consider the parties' financial resources. This Court disagrees.

A trial court is given great discretion in awarding attorney's fees and costs in a dissolution proceeding, and the court's decision should not be overturned unless it amounts to an abuse of discretion. *Silcox v. Silcox*, 6 S.W.3d 899, 905 (Mo. banc 1999). "The party challenging the award has the burden to prove an abuse of discretion, which will be found only where the decision is so arbitrary as to shock one's sense of justice." *Id.*; *Adair v. Adair*, 124 S.W.3d 34, 40 (Mo. App.2004). With respect to attorney's fees, "Missouri courts generally follow the 'American rule,' which provides that each party should bear his or her own litigation expenses." *Wansing v. Wansing*, 277 S.W.3d 760, 770 (Mo.App.2009). A trial court, however, may order one party to pay the other's attorney's fees and costs where such is authorized by statute. *Id.* In a dissolution action, § 452.355.1 RSMo (2000) provides that the trial court may award attorney's fees to a party after "considering all relevant factors including the financial resources of both parties, the merits of the case and the actions of the parties during the pendency of the action...." *Id.* Thus, a party's actions dur-

ing the pendency of litigation may be considered in determining whether to make an award for attorney's fees, especially when those fees were the result of the other party's improper conduct. *See Long v. Long*, 135 S.W.3d 538, 545 (Mo.App. 2004) (award of partial attorney's fees to wife was not an abuse of discretion because the trial court believed husband's actions caused the litigation fees and expenses to be higher than normal); *Adair*, 124 S.W.3d at 40–41 (husband's conduct during the litigation increased wife's attorney's fee expenses); *Bauer v. Bauer*, 38 S.W.3d 449, 457–58 (Mo.App.2001) (husband caused the trial to be "unduly protracted"). Moreover, "[i]n awarding attorney's fees, the trial court is considered an expert in the necessity, reasonableness, and value of the legal services." *In re Fuldner*, 41 S.W.3d 581, 596 (Mo.App. 2001).

In the case at bar, the trial court made a specific finding that Mother's misconduct during the litigation imposed a substantial financial burden upon Father and was the primary reason Father's attorney's fees were so high. Therefore, Mother's assertion that the trial court abused its discretion by not considering Mother's financial condition is misdirected. "The trial court may grant a partial award of attorney fees, even if the parties' financial condition does not otherwise necessitate an award of fees, where misconduct has taken place." *Hart v. Hart*, 210 S.W.3d 480, 494 (Mo.App.2007).

It is evident from this Court's review of the record that, just as the trial court found, Mother's conduct during the litigation did place a substantial financial burden upon Father and caused his attorney's fees to be substantially higher than normal. The amount of time, energy and financial resources expended on this dissolution action beggars the imagination. There were eight pretrial hearings over a

two-year span that produced 830 pages of transcript before the trial even started. Many of these hearings were necessitated by Mother's failure to comply with the trial court's orders regarding visitation and/or her unwillingness to cooperate with the GAL. Such behavior can constitute misconduct. *See, e.g., Miller v. Miller*, 184 S.W.3d 174, 186–87 (Mo.App.2006) (father's misconduct in litigating custody issues, which required large amounts of attorney hours, and in violating a court order was misconduct that supported an award of attorney's fees to wife); *Long*, 135 S.W.3d at 545; *Adair*, 124 S.W.3d at 40–41. The trial itself took three days and produced a transcript that was 1165 pages in length. The quantity of litigation in the instant case far exceeded that usually seen in a typical dissolution action. That conclusion is evident from the fact that total attorney's fees incurred in this litigation, just through trial alone, were over $125,000.

The trial court clearly acted within its discretion in determining the extent to which Father's attorney's fees were higher than normal due to Mother's misconduct in unduly protracting this litigation. *See Adair*, 124 S.W.3d at 41. Mother's misconduct provided an adequate ground for the trial court's partial award of attorney's fees to Father. *Id.*; *see Bauer*, 38 S.W.3d at 458. Mother's sixth point is denied.

### Point VII

█ Mother's seventh point deals with the assessment of GAL fees. Based on Mother's allegation that Father had physically abused the children, the GAL was appointed in June 2005. He attended every hearing involving the children, nearly all of which were necessitated by Mother's failure to comply with visitation orders entered by the court. According to the docket and transcripts on appeal, the GAL participated in numerous telephone conferences and attended at least seven hearings prior to trial. By April 2007, the court had issued five temporary visitation orders. During the GAL's investigation, he found no evidence that Father had abused any of the children.[22] Mother failed to keep the GAL advised of the children's residential address, making it difficult to stay in touch with the children. In the judgment, the court made a specific finding that Mother and the children made the GAL's job much more difficult because they "intentionally failed to keep the [GAL] informed because they are mad at him because he has not followed their wishes for no visitation with their father." In addition, the court found that "the children have each made unfounded complaints to the Missouri Bar Association alleging that the [GAL] has failed to perform his duties." The court concluded that "attorney J. Christopher Allen has performed his duties as [GAL] pursuant to the Standards set forth by the Missouri Supreme Court. As [GAL], he must advocate the children's best interest rather than merely seek to follow the children's wishes."

The court determined that the GAL fees totaled $18,807. Earlier in the litigation, the parties had paid $4,000 of the GAL fees. The court determined that the GAL fees were reasonable, and Mother was ordered to pay the outstanding balance of $14,807. The court specifically found that Mother's conduct during the litigation was the "primary reason ... the [GAL] fees were so high." The court then ordered that the balance due be "assessed against [Mother] and the same ... be deducted from [her] share of the funds held in the registry of this Court" from the parties' home foreclosure proceeds.

22. The court reached the same conclusion after considering all of the evidence presented at trial.

Mother contends the trial court abused its discretion in assessing the GAL fees against her "in light of the fact that [Mother] was also ordered to pay attorney fees ... and received a disproportionate share of the parties' property and debt." This Court disagrees.

By statute, the GAL "shall be awarded a reasonable fee for such services to be set by the court." § 452.423.5. In addition, "[t]he court, in its discretion, may ... [a]ward such fees as a judgment to be paid by any party to the proceedings ...." § 452.423.5(2). "When ordering the payment of guardian ad litem fees, the court may consider the circumstances which necessitated the appointment of the guardian." *Lindell v. Coen*, 896 S.W.2d 525, 529 (Mo.App.1995). In *Lindell*, the court taxed the costs of the proceeding against the mother and ordered her to pay the GAL fees based upon the court's finding that mother's " 'unfounded claims of abuse and neglect by [father] caused this Court to appoint' the guardian." *Id.* We reach the same conclusion here. Not only did Mother make unsubstantiated allegations of child abuse necessitating the GAL's appointment, but she also failed to cooperate with the GAL. That made his job more difficult. As the court specifically found, Mother's conduct was the "primary reason" the GAL fees were so high. "We cannot say that the award is so arbitrary and unreasonable as to constitute a manifest abuse of discretion." *Id.*; *see Clark v. Clark*, 101 S.W.3d 323, 331–32 (Mo.App. 2003). Mother's seventh point is denied.

The judgment of the trial court is affirmed.

BARNEY J., and SCOTT, C.J., Concur.